Anna HARRIS, Plaintiff–Appellant,

v.

Edna ITZHAKI; RAFAEL ITZHAKI, Defendants–Appellees.

No. 97–55901.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1999.

Submission Withdrawn Feb. 18, 1999.

Resubmitted July 1, 1999.

Decided July 12, 1999.

---

Elizabeth Brancart, Brancart & Brancart, Pescadero, California, for the plaintiff-appellant.

Bruce Janger, McHale and Connor, Los Angeles, California, for the defendants-appellees.

1. Honorable Thomas S. Zilly, United States District Judge for the Western District of

Before: HUG, Chief Judge, BROWNING, Circuit Judge, and ZILLY, District Judge.[1]

HUG, Chief Judge:

Anna Harris was a tenant of an apartment complex owned by the defendants at the time she filed an action under the Fair Housing Act for racial discrimination. During the pendency of the action she moved from the apartment complex. Ms. Harris appeals the district court's order dismissing her action for lack of standing and, in the alternative, granting the defendant's motion for summary judgment due to insufficient evidence. This court has jurisdiction to review final judgment entered by the district court pursuant to 28 U.S.C. § 1291. While we agree with the district court that Harris does not have standing for injunctive and declaratory relief, we conclude that Harris still has standing under the Fair Housing Act to seek money damages. We also conclude that Harris' claims are sufficient to survive summary judgment. Consequently, we affirm in part, reverse in part, and remand to the district court for further proceedings.

## PROCEDURAL AND FACTUAL BACKGROUND

Rafael and Edna Itzhaki (the "Itzhakis") own the property located at 1123 South Shenandoah Street in Los Angeles, California (the "Shenandoah Apartments"). Leah Waldman, an elderly tenant, has assisted the Itzhakis in the operation of the Shenandoah Apartments since they purchased the property. Ms. Waldman's assistance includes keeping spare keys of all the units, receiving rent checks, and showing vacant apartments to prospective tenants.

Washington, sitting by designation.

Generally, Mr. Itzhaki would instruct prospective tenants to contact Ms. Waldman in order to inspect a vacant unit available for rent at the Shenandoah Apartments. Mr. Itzhaki would then notify Ms. Waldman that prospective tenants would be visiting. Ms. Waldman would give the unit keys to prospective tenants to inspect units, and then give the prospective tenants rental applications along with the Itzhakis' telephone number for application submission. Finally, Ms. Waldman would call Mr. Itzhaki to inform him when prospective tenants visited the property.

Ms. Waldman also collected the rent checks for the Itzhakis. The tenants were instructed to pay their rent to Ms. Waldman or to leave it under her doormat. Ms. Waldman would then communicate to the Itzhakis who has paid rent and who has not.

Anna Harris became a resident of the Shenandoah Apartments in October 1994. Ms. Harris is the only African–American that the Itzhakis have ever rented to at this property. On December 6, 1995, Ms. Harris overheard a conversation between Ms. Waldman and the repairman/gardener regarding a recent vacancy in the building, in which Ms. Waldman stated, "The owners don't want to rent to Blacks." Ms. Harris immediately informed Ms. Waldman that her comments were "illegal and racist."

Ms. Harris complained to the Westside Fair Housing Council based on Ms. Waldman's statement. In response to that complaint, Westside Fair Housing Council tested the Shenandoah Apartments for racial discrimination through the use of black and white fair housing testers.

On December 21, 1995, Faith Bautista, a white fair housing tester posing as a prospective tenant, called Mr. Itzhaki and spoke with him regarding the vacancy at the Shenandoah Apartments. Mr. Itzhaki told Ms. Bautista that the rent was $700 per month. He did not inquire into Ms. Bautista's marital status or her current residence. He also made no negative remarks about the rental premises or area.

Instead, he told Ms. Bautista how to go about seeing the unit.

Approximately four hours later on that same day, Karla Ford, a black fair housing tester posing as a prospective tenant, called Mr. Itzhaki and spoke with him regarding the same vacancy at the Shenandoah Apartments. Mr. Itzhaki initially told Ms. Ford that the unit rented for $700 per month, but after inquiring about Ms. Ford's marital status, indicated that there would be an extra charge of $50 per month for two persons in a one-bedroom. Mr. Itzhaki told her that the place was small and that they usually preferred to rent to singles. He also stated that there was only one parking space with the unit and that since she was married she would need two spaces. Mr. Itzhaki then asked Ms. Ford where she was currently residing. When she said Culver City, Mr. Itzhaki commented that Culver City was a better area for safety reasons and questioned Ms. Ford why she would want the available unit, reiterating that the unit was small. Mr. Itzhaki then asked Ms. Ford where she and her husband worked, and closed with telling her how to inspect the unit and repeating that the unit was really small.

The following day, Karla Ford contacted Leah Waldman at the Shenandoah Apartments to inspect the vacant unit. Ms. Waldman gave her the key to the unit. After viewing the apartment, Ms. Ford told Ms. Waldman that she liked the unit. Ms. Waldman gave Ms. Ford two applications (one "just in case") and instructed her to copy down the owner's telephone number from the rental sign posted outside. When Ms. Ford asked about the rental price, application fee and security deposit, Ms. Waldman told her that she would have to speak to the owner because Ms. Waldman "didn't know anything." This conversation took place in Ms. Waldman's doorway.

Twenty minutes after Ms. Ford left the Shenandoah Apartments, Faith Bautista arrived and contacted Ms. Waldman to inspect the vacant unit. After viewing the

unit, Ms. Bautista asked Ms. Waldman about the rent and security deposit. Ms. Waldman said that the apartment rented for $700, with a $700 security deposit for a $1,400 move-in requirement. When Ms. Bautista indicated that she liked the unit, Ms. Waldman invited Ms. Bautista into her apartment and called the owner so that Ms. Bautista could discuss the details with the owner. Ms. Waldman introduced Ms. Bautista as "a beautiful girl who I'd love to have as my neighbor here, who would like to talk to you." During Ms. Bautista's conversation with Ms. Itzhaki, she was not told of any "extra charge" for two persons in a one-bedroom, despite informing Ms. Itzhaki that she was married. At the conclusion of the conversation, Ms. Waldman gave Ms. Bautista an application and the owner's fax number.

After Ms. Harris made the complaint to Westside Fair Housing Council she received two notices to pay rent or quit (for April 1996 and May 1996). Ms. Harris maintains that she left her rent checks under her doormat, pursuant to the accepted practice at the apartment.[2] Mr. Itzhaki claimed that the rent checks were not there on time. Although the Itzhakis have no formal policy on issuing three-day notices, they followed an informal procedure where Ms. Itzhaki would call the tenant whose rent had not been received by the tenth of the month. If the tenant failed to respond to the demand for payment, then the Itzhakis would proceed with a three-day notice. Ms. Harris maintains that she was not called or given any warning prior to receiving the three-day notices. Ms. Itzhaki does not remember calling Ms. Harris regarding the late rent payments for either April or May. Following each notice, Ms. Harris immediately forwarded payment to the Itzhakis.

Thereafter, Ms. Harris paid her rent by certified mail.

On June 12, 1996, Ms. Harris filed a complaint in the United States District Court for the Central District of California alleging that the Itzhakis discriminated against African–Americans on the basis of race or color in the operation of their apartment complex, in violation of the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1982, the California Fair Employment and Housing Act, California Government Code § 12955, the California Unruh Civil Rights Act, Civil Code § 51, et seq., and common law negligence.[3]

On May 23, 1997, the district court granted the Itzhakis' motion for summary judgment on two independent grounds. First, the district court dismissed Ms. Harris' action for lack of standing. As an alternative and independent basis for dismissing the case, the district court granted the Itzhakis' motion for summary judgment on the ground that Ms. Harris failed to produce "any admissible evidence supporting her claims of racial discrimination." This timely appeal followed.

## DISCUSSION

### I. Standing

■ We review the district court's decision that Ms. Harris did not have standing to sue under the Fair Housing Act de novo. San Pedro Hotel Co., Inc. v. City of Los Angeles, 159 F.3d 470, 474–75 (9th Cir.1998); Johns v. County of San Diego, 114 F.3d 874, 876 (9th Cir.1997).

■ The Supreme Court has long held that claims brought under the Fair Housing Act are to be judged under a very liberal standing requirement. Unlike ac-

2. Ms. Harris was given permission by the Itzhakis to place her rent check under her mat instead of Ms. Waldman's mat.

3. The district court limited its analysis to whether Ms. Harris alleged an injury cognizable under the Fair Housing Act, because the Fair Housing Act recognizes any injury that meets the Constitutional minimum. Based on this premise, this opinion will be limited to Ms. Harris' action under the Fair Housing Act. On remand the district court should consider each of Ms. Harris' claims, consistent with this opinion.

tions brought under other provisions of civil rights law, under the FHA the plaintiff need not allege that he or she was a victim of discrimination. *See Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 115, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (holding that Caucasian residents have standing under the Act to challenge racial discrimination against African–Americans in their neighborhood). Rather, the sole requirement for standing under the Act is the "Article III minima of injury in fact." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). To meet this requirement, a plaintiff need only allege "that as a result of the defendant's [discriminatory conduct] he has suffered a distinct and palpable injury." *Id.*

■ Under the Act, any person harmed by discrimination, *whether or not the target of the discrimination,* can sue to recover for his or her own injury. *See Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). "This is true, for example, even where no housing has actually been denied to persons protected under the Act." *San Pedro Hotel,* 159 F.3d at 475–76 (upholding standing of hotel owners in suit alleging that the City interfered with the housing rights of the mentally ill); *Smith v. Stechel,* 510 F.2d 1162, 1164 (9th Cir.1975) (real estate agent fired for renting apartments to minorities allowed to sue under the Act).

■ The Appellees and the district court, relying on *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), contend that Ms. Harris alleges a "stigmatic injury" based upon the alleged unequal treatment accorded prospective African–American renters. Appellees' arguments, however, conflate Ms. Harris' claims. The district court limited its analysis to Ms. Harris' claim of an indirect injury for alleged differential treatment of the rental testers. Following *Trafficante* and *San Pedro Hotel,* we conclude that Ms. Harris can maintain an action based solely on such an indirect injury because

she has alleged that she suffered "a distinct and palpable injury" resulting from the differential treatment, unlike the plaintiffs in *Allen.* Furthermore, Ms. Harris also claims that she has been injured directly by the eviction notices given contrary to established policy and claims injury from Ms. Waldman's discriminatory statement, both independent violations under the Fair Housing Act. Consequently, we conclude the evidence establishes that Ms. Harris is an "aggrieved person" and entitled to maintain an action under the Fair Housing Act.

■ Appellees cite *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), contending that Ms. Harris has lost standing, since Ms. Harris, after the district court order was entered, voluntarily gave notice that she would move out of the apartment, and now resides some 3000 miles away. In *Arizonans for Official English,* the Supreme Court reversed a Ninth Circuit *en banc* decision which awarded nominal damages—*which were not included in the plaintiff's initial prayer for relief*—in a dispute where the request for prospective relief became moot. *Id.* at 71, 117 S.Ct. 1055. In contrast, Ms. Harris has specifically pled for: (1) injunctive relief; (2) declaratory relief; (3) compensatory and punitive damages; (4) statutory damages; (5) costs of suit, including reasonable attorney's fees; and (6) all such other relief as the court deemed just. We conclude that Ms. Harris' request for declaratory and prospective injunctive relief are rendered moot by Ms. Harris' departure from the Shenandoah Apartments; however, her claims for damages are unaffected by *Arizonans for Official English.*

## II. Summary Judgment

We review the grant of summary judgment *de novo. Erickson v. Pierce County,* 960 F.2d 801, 805 (9th Cir.1992). We must determine, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues

of material fact and whether the district court correctly applied the relevant substantive law." *Id.* at 805–806.

Summary judgment under Rule 56(c) is only proper if no genuine issues of material fact exist for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). "If under any reasonable construction of the evidence and any acceptable theory of law, one would be entitled to prevail, the summary judgment against him cannot be sustained." *Garter–Bare Co. v. Munsingwear, Inc.,* 650 F.2d 975, 980 (9th Cir. 1980).

Issues of credibility, including questions of intent, should be left to the jury. *Lowe v. City of Monrovia,* 775 F.2d 998, 1008 (9th Cir.1985). When a plaintiff has provided direct and circumstantial evidence of discriminatory intent, she has established a prima facie case of disparate treatment and may be able to survive a motion for summary judgment on that evidence alone. *Id.; Warren,* 58 F.3d at 442 n. 1.

### A. Discrimination Claims Under the Fair Housing Act

"We apply Title VII discrimination analysis in examining Fair Housing Act discrimination claims." *Gamble v. City of Escondido,* 104 F.3d 300, 304 (9th Cir.1997). A plaintiff can establish a FHA discrimination claim under a theory of disparate treatment or disparate impact. *Id.* at 304–05.

To bring a disparate treatment claim, the plaintiff must first establish a prima facie case. Adapted to this situation, the prima facie case elements are: (1) plaintiff's rights are protected under the FHA; and (2) as a result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury. Establishing the prima facie case affords the plaintiff a presumption of discrimination. This test does not permit the court to consider rebuttal evidence at the prima facie case stage. *Lowe,* 775 F.2d at 1006.

After the plaintiff has established the prima facie case, the burden then must shift to the defendant to articulate some legitimate, nondiscriminatory reason for the action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To accomplish this, the defendant is only required to set forth a legally sufficient explanation. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Assuming the defendant can successfully rebut the presumption of discrimination, the burden shifts back to the plaintiff to raise a genuine factual question as to whether the proffered reason is pretextual. *Id.* at 255–56, 101 S.Ct. 1089. A plaintiff may succeed in persuading the court that she has been a victim of intentional discrimination, "either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. 1089. The trier of fact may consider the same evidence that the plaintiff introduced to establish a prima facie case in determining whether the defendant's explanation is merely pretext. *Id.* "Once a prima facie case is established … summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a [discrimination claim] is the elusive factual question of intentional discrimination." *Lowe,* 775 F.2d at 1009.

The Secretary of Housing and Urban Development ("HUD") ordinarily commands considerable deference in interpreting the FHA because HUD is the federal agency primarily assigned to implement and administer Title VIII. *Pfaff v. HUD,* 88 F.3d 739, 747 (9th Cir.1996). "Accordingly, we review with deference an agency's interpretation of the statute that it has responsibility to enforce, whether that interpretation emerges from an adjudicative proceeding or administrative rulemaking."

*Id.; Chevron USA, Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### B. Ms. Harris' Claims

Ms. Harris raises three independent claims under the FHA: (1) for eviction notices contrary to established policy; (2) for disparate treatment of rental testers; and (3) for the discriminatory statement by Ms. Waldman. Central to this analysis is the characterization of evidence by the parties. Appellees seek to consider and justify each piece of evidence separately. In contrast, Ms. Harris asks this court to look at the evidence as components of a larger whole.

### 1. Eviction Notices Contrary to Established Policy

The FHA makes it unlawful to: (1) deny a dwelling to any person because of race (42 U.S.C. § 3604(a); 24 C.F.R. § 100.50(b)(1)); (2) discriminate against any person in the *terms, conditions* or privileges of rental of a dwelling because of race (42 U.S.C. § 3604(b); 24 C.F.R. § 100.50(b)(2)); and (3) coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of any right granted or protected by §§ 3603–06 of this title (42 U.S.C. § 3617). Additionally, HUD regulations state that it is unlawful to use different provisions in leases or contracts of sale, such as those relating to rental charges because of race. (24 C.F.R. § 100.65(b)(1)). ·

 Ms. Harris confronted Ms. Waldman regarding her discriminatory statement in December 1995. Four months later, the Itzhakis contend they did find her check under Ms. Harris' doormat, the previously agreed method of payment. The accepted practice was for Mrs. Itzhaki to call the tenant before sending a three-day notice. The following month, the same incident occurred, causing Ms. Harris to send all subsequent payments by certified mail. Ms. Harris presented evidence that she suffered emotional distress

as a result of the notices and feared a racially motivated eviction in the future. Under these facts, we conclude that Ms. Harris has established a prima facie disparate treatment claim under the FHA—that Harris, as a protected class member under the FHA, was subject to eviction proceedings that were contrary to the established policy and practice. Consequently, Ms. Harris contends she suffered emotional distress and disruption in the quiet enjoyment of her apartment.

 The Itzhakis contend that the check wasn't there. They assert that the check could have been stolen or lost within the unsecured building. Furthermore, while the Itzhakis don't remember calling Ms. Harris, they contend that this is merely a courtesy and consequently should not implicate FHA liability. Here the Itzhakis have provided a nondiscriminatory reason for their action—that they simply didn't get the check and that the phone call is merely a courtesy to the tenant.

Ms. Harris contends that the Itzhakis' explanation is merely pretext, citing circumstantial and direct evidence from her other claims, including the discriminatory statement by Ms. Waldman and the treatment of the rental testers. Under these facts, applying the shifting burden analysis of *McDonnell Douglas* and *Burdine,* we conclude that there is genuine factual question as to whether the Itzhakis' nondiscriminatory reason is pretextual, thereby making summary judgment inappropriate. *See also Lowe,* 775 F.2d at 1009; *Smith v. Town of Clarkton,* 682 F.2d 1055, 1066 (4th Cir.1982) (holding that deviations from a procedural norm are suspect when they lead to results impacting more harshly on one race than on another). We reverse the district court's dismissal of Harris' eviction notice claim to the extent that retrospective relief is available.

### 2. Disparate Treatment of Rental Testers

The FHA makes it unlawful to represent to any person because of race that any dwelling is not available for inspection or

rental when such dwelling is in fact so available. 42 U.S.C. § 3604(d). Additionally, HUD regulations state that it is unlawful to: (1) provide false or inaccurate information regarding the availability of a dwelling for rental to any person, including testers, regardless of whether such person is actually seeking housing, because of race (24 C.F.R. § 100.80(b)(5)); (2) discourage any person from inspecting or renting a dwelling because of race (24 C.F.R. § 100.70(c)(1)); (3) discourage the rental of a dwelling because of race by exaggerating drawbacks or failing to inform any person of desirable features of a dwelling or of a community, neighborhood or development (24 C.F.R. § 100.70(c)(2)); and (4) deny or delay the processing of an application made by a renter because of race (24 C.F.R. § 100.70(d)(3)).

▇ The rental testers were treated differently by Mr. Itzhaki with regard to: (1) the owner's rental preferences (no preference told to white tester; black tester told that owner prefers singles); (2) the rent charged ($700 for white tester; black tester told that owner may charge an additional $50 for two people); (3) description of the unit (a one bedroom for the white tester; black tester told unit is really small); and (4) safety of the neighborhood (safety not discussed with white tester; black tester told area unsafe).

The testers were also treated differently by Ms. Waldman with regard to: (1) the terms of the rental (white tester told rent, deposit & total move-in cost; black tester told to contact owner); (2) encouragement to pursue the property (white tester invited into Ms. Waldman's home to call owner; black tester told to get owner's telephone number from sign outside); (3) endorse-

ment to the owner (white tester introduced as "a beautiful girl who I'd love to have as my neighbor"; black tester was not endorsed to the owner). Under these facts, we conclude that Ms. Harris has established a prima facie disparate treatment claim under the FHA—that the black tester as a protected class member was discouraged from renting the apartment, while the white tester was given preferential treatment, and as a result of these actions, Ms. Harris was deprived of the opportunity to live in an apartment free of housing discrimination.

▇ Again, the Itzhakis provide a nondiscriminatory reason—that the distinctions between these conversations are the consequence of bad timing and differing personality types, rather than discriminatory intent.[4]

Ms. Harris again contends that the Itzhakis' explanation is merely pretext. A reasonable inference can be drawn from these facts that Mr. Itzhaki sought to discourage the black tester, citing safety and size. Ms. Harris argues that these actions are inconsistent with an interest to fill a rental vacancy. Furthermore, Ms. Harris contends that Ms. Waldman serves as a filter, where Blacks are screened out for the owner. Under these facts, applying the shifting burden analysis of *McDonnell Douglas* and *Burdine*, we conclude that there is a genuine factual question as to whether the Itzhakis' nondiscriminatory reason is pretextual, thereby making summary judgment inappropriate. *See also Lowe*, 775 F.2d at 1009; *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1422 (11th Cir.1984) (upholding an injunction against landlords who offered "prospective white tenants encouragement that had not

---

**4.** Additionally, the Itzhakis assert that Ms. Harris was not discriminated against when she became a resident of the apartment building in 1994. Consequently, the Itzhakis contend that Ms. Harris has not been deprived of an integrated building that is free of housing discrimination. *Trafficante, Gladstone* and *Havens* stand for the proposition that there is an enforceable right under the FHA to live in a building, town or neighborhood that is free

of housing discrimination. We reject the Itzhakis' contention that since Ms. Harris already lives in an integrated community (as the only African–American tenant), she cannot allege an injury from subsequent discriminatory conduct against other prospective African–American tenants. The fact that the building is integrated cannot serve to insulate the Itzhakis from liability for violations of the FHA.

been given to blacks ..."); *McDonald v. Verble,* 622 F.2d 1227, 1234 (6th Cir.1980) ("[D]isparity of treatment between whites and blacks, burdensome application procedures, and tactics of delay, hindrance, and special treatment must receive short shrift from the courts."). We reverse the district court's dismissal of Ms. Harris' rental tester claim to the extent that retrospective relief is available.

### 3. Ms. Waldman's Discriminatory Statement

 The FHA makes it unlawful for owners or their agents to make any statement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on color or an intention to make any such preference, limitation or discrimination. 42 U.S.C. § 3604(c); 24 C.F.R. 100.50(b)(4). Furthermore, HUD states that 42 U.S.C. § 3604(c) applies to all oral notices or statements by a person engaged in the rental of a dwelling. 24 C.F.R. 100.75(b). *See also Soules v. HUD,* 967 F.2d 817, 824 (2d Cir.1992) ("Openly discriminatory oral statements merit ... straightforward treatment."). Ms. Harris has asserted a prima facie case of discrimination under the FHA—that Ms. Waldman's discriminatory statement caused Ms. Harris emotional distress and disruption in the quiet enjoyment of her apartment.

 The Itzhakis do not contest that Ms. Waldman made the statement; rather they contend that Ms. Waldman is not an agent or employee, thereby making any statements inadmissible. We disagree.

 The question whether an agency relationship exists for purposes of the Fair Housing Act is determined under federal law, not state law. *Cabrera v. Jakabovitz,* 24 F.3d 372, 386 n. 13 (2d Cir.1994). The policy reason underlying the application of federal law is to avoid predicating

liability for Fair Housing Act violations on the vagaries of state law. *Id.* Furthermore, the question of agency should be submitted to the jury unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts. *Id.* at 386.

Ms. Waldman has assisted the Itzhakis by collecting rent checks and showing vacant units to prospective tenants. Ms. Harris points to these facts supporting her contention that Ms. Waldman is an agent or employee of the Itzhakis. The Itzhakis, however, point to the fact that they don't pay Ms. Waldman or offer her any discount on rent, supporting their contention that Ms. Waldman is not their agent or employee.

HUD regulations define an agent under the FHA as *"any person authorized to perform an action* on behalf of another person *regarding any matter related* to the ... rental of dwellings, including offers, solicitations or contracts *and the administration of matters* regarding such offers, solicitations or contracts or any residential real estate-related transactions." 24 C.F.R. § 100.20 (emphasis added). Under HUD's definition, which is afforded deference, there are facts from which a jury could reasonably find that Ms. Waldman is an agent of the Itzhakis.

 Federal Rule of Evidence ("FRE") 801(d)(2)(D) requires the proffering party to lay a foundation to show that an otherwise excludable statement relates to a matter within the scope of the agent's employment. *Breneman v. Kennecott Corp.,* 799 F.2d 470, 473 (9th Cir.1986); *Hoptowit v. Ray,* 682 F.2d 1237, 1262 (9th Cir.1982). If the jury finds that Ms. Waldman was the Itzhakis' agent, her statement —"The owners don't want to rent to Blacks"—would be admissible, since it relates to a matter within the scope of the agency, i.e. showing empty apartments.[5]

5. Alternatively, "where an employee's superior has instructed the employee to act in furtherance of a fraudulent scheme, statements made by the employee relating to that scheme are admissible against the superior under

FRE 801(d)(2)(D)." *Plastino v. Eureka Fed. Sav. and Loan Ass'n (In re Sunset Bay Assoc.),* 944 F.2d 1503, 1519 (9th Cir.1991); *U.S. v. Gibson,* 690 F.2d 697, 701 (9th Cir.1982).

The Itzhakis contend that Ms. Waldman's statement should be treated as a "stray" remark, insufficient to establish discrimination. If the remark is unrelated to the decisional process, then it is insufficient to show discrimination. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990); *Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989). Ms. Harris contends that Ms. Waldman acts as a filter for the Itzhakis, thereby making her comments related to her decision to recommend tenants. Viewing the evidence in the light most favorable to Harris, we cannot hold that Ms. Waldman's statement is a stray remark as a matter of law. Consequently, we reverse the district court's dismissal of Harris' discriminatory statement claim to the extent that retrospective relief is available.

### CONCLUSION

The order dismissing Harris' claims for lack of standing are affirmed with regard to declaratory and prospective relief. The order dismissing Harris' claim for lack of standing for retrospective relief is reversed. The district court's order dismissing Harris' claims under the Fair Housing Act for insufficient evidence is reversed. Plaintiff-Appellant is awarded costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Ms. Harris contends that the Itzhakis engaged in a fraudulent scheme to circumvent the FHA and unlawfully discriminate against

Blacks. Consequently, Ms. Waldman's statement could be admissible, as a statement relating to the fraudulent scheme.