**Deepika MARYA and Kriti Aurora, Plaintiffs**

v.

**Linda L. SLAKEY and Paul Norris, Defendants**

**No. CIV.A. 99–30064–FHF.**

United States District Court, D. Massachusetts.

Nov. 20, 2001.

Lawrence J. Farber, Allan K. Cook, Amherst, MA, Alfred P. Chamberland, Easthampton, MA, Richard A. Habhab, The Law Offices of Alfred P. Chamberland, for Defendants.

## MEMORANDUM AND ORDER

FREEDMAN, Senior District Judge.

## I. INTRODUCTION

In this action, the plaintiff, Kriti Aurora ("Aurora")[1] alleges that the defendants, Paul Norris ("Norris") and Linda L. Slakey ("Slakey") (collectively "defendants"), denied her housing in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a) and (c); the Civil Rights Act, 42 U.S.C. §§ 1981, 1982; and Mass. Gen. Laws ch. 151B. In addition, the plaintiff alleges negligence based on the same underlying facts. Now before the Court is the defendants' motion for summary judgment pursuant to Fed. R.Civ.P. 56(c) ("Rule 56(c)").

## II. BACKGROUND

Defendant Slakey owns a six-bedroom residential property at 83 Prospect Street, Amherst, Massachusetts (the "residence"). Throughout the time she has owned the residence, Slakey leased the residence to six unrelated individuals, one of whom occupied each of the six bedrooms, and who collectively shared the common areas within the house. Each year, the six tenants executed a single, twelve-month joint and several lease. By its terms, the lease obligated the lessors to pay annual rent of $19,200 in monthly installments of $1,600, but contained no reference to the specific amount of rent due the landlord from each individual tenant.

Hugh D. Heisler, Heisler & Fields, Springfield, MA, for Plaintiffs.

1. Plaintiff Deepika Marya was dismissed from this action pursuant to this Court's February 16, 2000 Memorandum and Order.

Turnover among tenants in the residence was relatively high. Between the summer of 1993 and the summer of 1999, for instance, approximately twenty different tenants resided there. Although the lease did not specify how new tenants would be selected, the tenants generally assumed responsibility for publicizing vacancies and selecting prospective tenants. After posting advertisements regarding the vacancy, the tenants scheduled one-on-one interviews with candidates. Decisions about which candidate to select were reached by the unanimous verdict of the tenants; accordingly, the objection of any tenant resulted in the rejection of an application. All tenants, however, were required to be students, vegetarians, and non-smokers. The candidate who was ultimately selected by the tenants to fill the vacancy was then passed on to Slakey. Whenever a tenant moved out of the premises and a new tenant moved in, Slakey entered into a new lease with the reconstituted group of tenants, or simply modified the old lease to include the name of the new resident.

Historically, Slakey's role in the selection of new tenants was limited. Indeed, she neither interjected herself into the tenant selection process nor rejected any applicant who had been accepted by her tenants. Nevertheless, the express terms of the lease reposed in Slakey the authority to either accept or reject the candidates who had been chosen by her tenants.[2] In addition, Slakey was responsible for checking the references of prospective tenants, although she rarely exercised this prerogative.

In August 1998, a tenant notified Slakey that she would be terminating her tenancy at the end of the following month. Shortly thereafter, plaintiff Arora applied to fill the vacancy. Arora is a citizen and native of India who came to the United States in August 1995 to pursue graduate studies at the University of Massachusetts ("UMass"). At the time she applied to fill the vacancy, she satisfied the traditional criteria applied by the tenants in evaluating applicants: she was enrolled at UMass, and she is a vegetarian and non-smoker. However, Arora's application was rejected by two tenants: Suzanne Castello and defendant Paul Norris.

Castello explained her decision to vote against Arora as rooted in a personality conflict. Norris, who also voted against Arora, indicated that he rejected Arora's application because she is an Indian woman. Specifically, he stated on three separate occasions that he did not want to live with three Indian women; at the time of the vote, two Indian women already lived in the residence. For instance, in a conversation with Sowmya Karthikeyan, a cotenant, in September 1998, Norris stated that he did not want three Indian women in the house, and he did not want the house dominated by one culture. He added, "I can understand that you might think I'm a racist, but I can live with that," or words to that effect. On or about the morning of September 16, 1998, Norris related to Deepika Marya, another tenant, that he did not want Arora as a tenant because he did not want "a preponderance of one culture" in the house. Later that day, Arora, who had scheduled her interview with Norris on September 16, 1998, called Norris to explain that she needed to reschedule the interview because she was not feeling well. Norris responded that

---

**2.** The lease provides, in pertinent part: "The Lessees further promise to ... not make or suffer any waste thereof, nor lease, nor underlet, nor permit any other person or persons to occupy the same ... but with the approbation of the Lessor thereto, in writing, having first been obtained."

there would be no need for an interview because he had already decided to reject her application. He then repeated his position that he did not want to live in the same house with three people of the same cultural orientation. Arora quickly terminated the conversation.

On the evening of September 16, 1998, Marya and Karthikeyan, accompanied by a friend who was not a tenant, Leah Wing, met with Slakey at her home. They recounted to Slakey the substance of Norris' comments, and expressed concern about the reason given by Norris for his rejection of Arora's application. They requested that Slakey, as owner of the residence, intervene in the tenant selection process. Slakey initially replied that Norris had the right to decide for himself who he wanted to live with, but she later stated that she would speak with Norris before arriving at a final decision.

One or two days later, Slakey met with Marya and Wing. She confirmed that she had spoken with Norris regarding the reason for his vote against Arora's application, and stated that she did not intend to involve herself further in the tenant selection process. The vacancy was eventually filled by Aleck Ma, who did not meet the traditional selection criteria because he was not a student.

On March 29, 1999, Marya and Arora filed a complaint with this Court, alleging that Norris, acting as Slakey's agent, denied them housing in violation of the Fair Housing Act ("FHA"), the Civil Rights Act ("CRA"), and Mass. Gen. Laws, chapter 151B ("chapter 151B"). On February 16, 2000, this Court granted the defendants' motion to dismiss plaintiff Marya from the action, on the ground that she lacked standing to maintain her discrimination claim.

## III. STANDARD OF REVIEW

In evaluating a motion for summary judgment, the Court reviews the record evidence "in the light most flattering to the nonmovant and indulge[s] all reasonable inferences in that party's favor." *NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 32 (1st Cir.1994) (quotations and brackets omitted). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Where, as in this case, the movants are the defendants, "they must begin ... by averring the absence of any evidence sufficient to support some necessary element of the plaintiff's case. To avoid summary judgment, the plaintiff then must sound a contrapuntal note, pointing to evidence in the record sufficient to establish the existence of a 'genuine' issue of 'material' fact." *Rogan v. City of Boston,* 267 F.3d 24, 26–27 (1st Cir.2001). "In this context, 'genuine' means that the evidence could resolve the point in favor of the nonmoving party, while 'material' means that the fact has the potential to affect the outcome of the suit under the applicable law." *NASCO, Inc.,* 29 F.3d at 32 (quotations, citations and emphasis omitted).

## IV. DISCUSSION

Arora alleges that the defendants denied her housing on the basis of her race, color, national origin, and/or sex in violation of the FHA, the CRA, and chapter 151B. The FHA, which broadly prohibits discrimination in housing, embodies "a broad legislative plan to eliminate all traces of discrimination within the housing field." *Holley v. Crank,* 258 F.3d 1127, 1130 (9th Cir.2001). Moreover, the FHA is "inclusive in pro-

tecting against conduct which interferes with fair housing rights and is subject to generous construction." *Texas v. Crest Asset Mgmt., Inc.,* 85 F.Supp.2d 722, 727 (S.D.Tex.2000).

The defendants now move for summary judgment on the ground that Norris was not acting as Slakey's agent for the purposes of renting vacant rooms in the premises. In addition, the defendants argue that: (1) Norris is not within the jurisdiction of the Fair Housing Act because he is not in the business of selling or renting dwelling space; (2) a second vote against Arora's candidacy by another tenant, Costello, renders Norris's allegedly discriminatory action void and without legal effect; and (3) the exemption requirements established by 42 U.S.C. § 3603(b)(2) are met in this case. The Court will address each argument in turn.

### A. Agency

#### 1. Fair Housing Act and Civil Rights Act

■ The defendants assume that Massachusetts law governs the issue of agency in this case. *See* Defendants' Motion for Summary Judgment at 7. This assumption, however, is not entirely correct. "The question of whether an agency relationship exists for the purposes of the [FHA] is determined under federal law, not state law." *Harris v. Itzhaki,* 183 F.3d 1043, 1054 (9th Cir.1999); *see Cabrera v. Jakabovitz,* 24 F.3d 372, 386 n. 13 (2d Cir.1994), *cert. denied,* 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994); *Northside Realty Assocs., Inc. v. United States,* 605 F.2d 1348, 1354 n. 13 (5th Cir.1979); *Marr v. Rife,* 503 F.2d 735, 740 (6th Cir. 1974). Federal law also applies to the question of agency pursuant to Arora's Civil Rights Act claims. *See Wright v. Owen,* 468 F.Supp. 1115, 1118 (E.D.Mo. 1979) (using federal law to analyze ques-

tion of agency in housing discrimination action brought pursuant to CRA).

It is well established that a principal is liable for the wrongful acts of his or her agent in FHA housing discrimination claims. *E.g., Hamilton v. Svatik,* 779 F.2d 383, 388 (7th Cir.1985). To ascertain whether an agency relationship exists, the federal courts look to the Restatement (Second) of Agency (1958). *Cabrera,* 24 F.3d at 386; *Inland Mediation Bd. v. City of Pomona,* 158 F.Supp.2d 1120, 1139 (C.D.Cal.2001). In addition, the Department of Housing and Urban Development ("HUD") has promulgated its own definition of "agency" which parallels the Restatement definition, and to which the federal courts afford "considerable deference." *Holley,* 258 F.3d at 1130; *see* 24 C.F.R. § 100.20. At least two courts of appeal, moreover, have instructed that "the question of agency should be submitted to the jury unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts." *Harris,* 183 F.3d at 1054; *see Cabrera,* 24 F.3d at 386 n. 14.

Under the Restatement, agency results from "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency, § 1. To satisfy this definition, Arora must show that: (a) defendant Slakey, the alleged principal, manifested that Norris shall act for her; (b) Norris, the alleged agent, manifested his acceptance of such authority; and (c) both parties understood that Slakey was to exercise a degree of control over Norris's activities while he was acting as Slakey's agent. *See Cabrera,* 24 F.3d at 386. To satisfy the definition of agency contained in the HUD regulations, a jury must be able to infer from the evidence that Norris

was "authorized to perform an action on behalf of [Slakey] regarding any matter related to the sale and rental of dwellings." 24 C.F.R. § 100.20.

█ Vicarious liability may rest upon the existence of either an actual or an apparent agency relationship. *See Inland Mediation Bd.*, 158 F.Supp.2d at 1139–40.

Actual agency exists where: (a) a principal manifests to another that the other has the authority to act on the principal's behalf and subject to the principal's control; and (b) the other, or agent, consents to act on his principal's behalf and subject to the principal's control. Apparent agency, however, unlike actual agency, which exists whether or not the third party knows of or suspects an agency relationship, depends in large part upon the representations made to the third party and upon the third party's perception of those representations.

*Id.* at 1140 (quotations and citations omitted); *see* Restatement (Second) of Agency, §§ 1, 8. In this case, however, Arora cannot establish apparent authority because she does not allege that Slakey ever met with Arora. The Court, therefore, will evaluate only whether she sets forth facts from which a jury could reasonably find that Norris acted with actual authority.

█ Arora first contends that Slakey expressly delegated authority for applicant screening and selection to Norris. As evidence of this express delegation, Arora points to Slakey's deposition, in which she was asked whether she and her tenants discussed the process for filling vacancies. Slakey responded, "I probably at some point reiterated the intent that they would choose their own housemates, that that was the agreement between us." Affidavit of Hugh Heisler, Exhibit 1, at 2. Later, she stated that she and the tenants shared a "mutual understanding that they would select a household that they experienced as

compatible, and . . . that they would give me a slate of names in time for me to prepare a new lease at the beginning of the rent year." *Id.* at 3. Slakey, however, could not remember which tenants were included in that conversation, and did not state that Norris was present for the meeting. *Id.* Although it is likely that Slakey directly authorized some of her tenants to undertake responsibility for soliciting and selecting new tenants, it is not even alleged that Norris was among this group of tenants. Accordingly, the Court cannot conclude that a reasonable jury could find that Slakey expressly authorized Norris to recruit and select new tenants.

█ However, the consent required to form an agency need not be expressly stated. "Agency is a legal concept which depends on the manifest conduct of the parties, not on their intentions or beliefs as to what they have done." *Interocean Shipping Co. v. Nat'l Shipping and Trading Corp.*, 523 F.2d 527, 537 (2d Cir.1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976) (*quoting* Restatement (Second) of Agency § 1, comment B). Therefore, an agency may be established "through actual conduct of the parties and regardless of written or other specific authority negativing or limiting the existence or extent of an agency." *Barefoot v. Int'l B'hood of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 424 F.2d 1001, 1004–05 (10th Cir.1970), *cert. denied*, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 257 (1970); *see* Restatement (Second) of Agency § 26 ("authority to do an act can be created by . . . conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.") "It is generally understood, however, that the ostensible authorization must result from the words and conduct of the princi-

pal rather than the agent." *Barefoot,* 424 F.2d at 1005.

At least two federal courts have found property owners liable for the discriminatory actions of tenants who assisted in the rental of vacant apartments, but were not professional agents or property managers, based solely on the conduct of the parties. *See Harris,* 183 F.3d at 1054; *Wright,* 468 F.Supp. at 1118. In *Harris v. Itzhaki,* for instance, the court denied the defendant's motion for summary judgment on the question of agency between the defendant property owners and an elderly tenant who assisted the owners in the operation of their apartment building by receiving rent checks and showing vacant apartments to prospective tenants. *Harris,* 183 F.3d at 1048, 1054. Although the tenant did not receive a salary or any discount in rent in exchange for her assistance, the court held that there were sufficient facts from which the jury could find an agency pursuant to the HUD regulations. *Id.* at 1054.

Similarly, in *Wright v. Owen,* the court found the property owner liable under 42 U.S.C. §§ 1981 and 1982 for the discriminatory actions of a tenant, Mrs. Stein, who showed a vacant apartment to black applicants, discouraged their application, but encouraged the application of a white applicant, Mrs. Epstein. *Wright,* 468 F.Supp. at 1118. Mrs. Stein advised the landlord of Mrs. Epstein's interest, and the landlord stated that Mrs. Epstein could rent the apartment. *Id.* The court concluded: "Although Mrs. Stein was not the designated agent of [the] defendant ... to rent her apartment, defendant's apparent acceptance of Mrs. Epstein as a tenant is sufficient to establish an agency relationship by conduct." *Id.*

In this case, the Court concludes that there is sufficient evidence of the conduct of Slakey and Norris from which a reasonable jury could find the existence of an agency under Arora's FHA and CRA claims. The record reflects that a vacancy arose in the residence on approximately twenty occasions between 1993 and 1998. On each occasion, Norris and the other tenants were actively involved in posting the advertisements, and selecting each new tenant who moved into the residence. Like the tenants in *Harris* and *Wright,* therefore, Norris assisted his landlord by facilitating the process by which vacancies were filled. *See Harris,* 183 F.3d at 1054; *Wright,* 468 F.Supp. at 1118. Moreover, no candidate was selected without the express approval of each tenant, and Slakey never rejected any of her tenants' selections, although the lease expressly reserved her right to do so. To the contrary, Slakey simply acquiesced in her tenants' selections, entering into a new lease with the newly constituted group of tenants, or modifying the old lease to include the name of the new tenant. In the case of Arora's application, Slakey acquiesced in Norris's decision to reject the application after speaking with many of her tenants, including Norris, regarding the origin of the dispute surrounding her rejection. Slakey's acceptance of her tenants' decisions to accept or reject applicants, like that of the landlord in *Wright,* is sufficient to establish an agency relationship by conduct. *See Wright,* 468 F.Supp. at 1118. Thus, the Court cannot conclude that the evidence is clearly insufficient to establish the existence of an agency relationship between Slakey and Norris. *See Harris,* 183 F.3d at 1054.[3]

---

**3.** Arora also argues that an agency can be established because Slakey ratified Norris's

actions. This argument, however, does not withstand serious scrutiny. "Ratification

█ The defendants challenge the existence of an agency relationship between Norris and Slakey on two fronts. First, the defendants assert that there is no evidence of "continuous control and direction exercised by Slakey over Norris ... such as would support a finding of agency." Defendants' Motion for Summary Judgment at 14. It is true that the right of control by the principal over the agent is an irreducible element of an agency relationship. *See* Restatement (Second) of Agency §§ 1, 14. However, the defendants exaggerate the quantum of control necessary to establish an agency. "The control of the principal does not ... include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective." *Id.* at § 1. In this case, the lease clearly reposes the ultimate decision-making authority for the selection of tenants in Slakey, as owner of the residence. *See* Defendants' Motion for Summary Judgment, Exhibit A. In her deposition testimony, moreover, Slakey stated that she felt that she would have been within her rights as owner of the premises to reject candidates whose names were presented to her by her tenants. *See* Affidavit of Hugh Heisler, Exhibit 1, at 5. In addition, Slakey had the power, although rarely exercised, to check the references of candidates selected by her tenants. This is sufficient to establish control as an element of the agency relationship.[4] *Compare Cabrera*, 24 F.3d at 388 n. 15 (citing to unpublished case from the Southern District of New York, in which the court

found control by owner over broker, in pertinent part, because the rentals arranged by the broker were subject to owner's approval) *with Walker v. Fox*, 395 F.Supp. 1303, 1304 (S.D.Ohio 1975) (concluding that church, as landlord, did not have control over tenant, who ran boarding house in building leased from church, because church had no control over amount of rent charged or persons to whom she rented).

█ Second, the defendants suggest that Slakey did not benefit from the efforts of Norris, and the other tenants, to fill vacancies in the residence. Specifically, the defendants point out that, under the joint and several lease, the tenants were required to satisfy the entire rent obligation. Therefore, the defendants asseverate, the actions of the tenants were taken solely for their own benefit, not for the benefit of Slakey. The record evidence, however, belies this contention. As Arora persuasively argues, Slakey benefits from the efforts of her tenants in that she is relieved of the burden and expense of advertising the vacancies, showing the premises to prospective tenants, and interviewing applicants. Unfortunately for the defendants, they cite to no authority to show that the principal must "benefit" from the agency relationship in a pecuniary manner. Thus, the Court concludes that Slakey benefitted from the efforts of Norris in facilitating the rental of vacant rooms in the residence. *See Cabrera*, 24 F.3d at 388 (agency relationship between property owner and real estate broker ex-

does not result from the affirmance of a transaction with a third person unless the one acting purported to be acting for the ratifier." Restatement (Second) of Agency § 85(1). Because Arora does not contend that Norris purported to act on behalf of Slakey, the doctrine of ratification does not apply to the facts of this case.

4. The fact that Slakey's tenants signed a single, joint and several lease does not diminish the degree of Slakey's control over the leasing of rooms. Under the express terms of the lease, Slakey retained virtually unfettered discretion in the selection of new tenants at the end of the term of the lease.

ists where "landlords benefitted from brokers' service by renting their vacant apartments.")

2. Chapter 151B

■ Finally, the Court reaches the question of agency pursuant to Arora's chapter 151B claims. After considerable research, the Court observes that the analysis of whether an agency exists between Norris and Slakey is similar under Massachusetts law and federal law. *See, e.g., LaBonte v. White Constr. Co., Inc.,* 363 Mass. 41, 292 N.E.2d 352, 355 (1973) (holding that existence of agency "can be implied from a course of conduct showing that a principal has repeatedly acquiesced therein and adopted acts of the same kind.") The Court, therefore, concludes that there is sufficient evidence of the parties' conduct from which a reasonable jury could find the existence of an agency pursuant to Arora's chapter 151B claim. *See id.* Accordingly, the Court also denies the defendants' motion for summary judgment as to Arora's claims pursuant to chapter 151B.

*B. Remaining Arguments*

■ Next, the defendants argue that Norris is exempt from the provisions of the FHA because he is not engaged in the business of selling or renting dwelling space. The defendants do not cite to any authority to support this proposition, and the Court rejects the argument as contrary to case law and the HUD regulations. *See Coates v. Bechtel,* 811 F.2d 1045, 1051 (7th Cir.1987) (principal's liability "is unaffected by the fact that the person committing the discriminatory acts in the course of disposing of the property is a relative or a neighbor rather than a professional real estate agent."); 24 C.F.R. § 100.20 (defining agent as "*any person*

authorized to perform an action ....") (Emphasis added.)

■ In addition, the defendants contend that the vote of another tenant, Castello, against Arora's application "rendered Norris's allegedly unlawful action nugatory." Defendants' Motion for Summary Judgment at 18. The Court concludes that this argument is wholly without merit. Once again, the defendants fail to cite any authority to support their position. Further, the Court declines their invitation to construe the FHA so narrowly, given that it is ordinarily "subject to a broad construction." *Texas,* 85 F.Supp.2d at 727.

■ Finally, the defendants contend that Norris meets the exemption requirements of 42 U.S.C. § 3603(b)(2). That section provides that the FHA does not apply to "rooms or units in dwellings containing living quarters occupied or intended to be occupied ... by no more than four families living independently of each other, *if the owner actually maintains and occupies one of such living quarters as his residence.*" (Emphasis added.) Here, the residence is not owner-occupied, and thus the exemption cited by the defendants does not apply to this case.

V. CONCLUSION

Accordingly, the Court DENIES the defendants' motion for summary judgment.

It is So Ordered.