DECISION
This case is before the Court for decision following a non-jury trial on a complaint by Roger N. Carlsten (Plaintiff/Carlsten) against The WideCom Group, Inc. (Defendant/WideCom), John Keenan (Defendant/Keenan), Vincent R. DiGiulio (Defendant/DiGiulio) and Schneider Securities, Inc. (Defendant/Schneider or Schneider Securities). In said complaint, Plaintiff seeks to establish claims of racketeering, breach of contract, conversion, fraud and vicarious liability. The decision herein rendered is in accordance with Superior Court Rules of Civil Procedure Rule 52.
 FACTS AND TRAVEL
A. Timeline of Events
The chronology of events relevant to this case is as follows. In July 1991 and September 1991 respectively, Defendant Keenan and Defendant DiGiulio became employed by Defendant Schneider Securities. Plaintiff'sExhibit 48 (Defendant Schneider Securities, Inc.'s Response toPlaintiff's Request for Admission, Response to Request No. 2 
Response to Request No. 3). Defendant Keenan worked for Defendant Schneider Securities through January 24, 1992, and Defendant DiGiulio's tenure at Schneider Securities continued through April 2, 1993. Id.
Plaintiff knew Defendants DiGiulio and Keenan in his capacity as a client of theirs at Schneider Securities. Plaintiff's Post-TrialMemorandum of Law at 6 ("Carlsten testified that he knew that DiGiulio worked for Schneider Securities as a stockbroker at the time, because Carlsten already had an account with Schneider that was handled by DiGiulio") (hereinafter Plaintiff's Memorandum); Plaintiff's Exhibit 1
(Plaintiff's Schneider Securities account statements dated August 1991-November 1991, indicating Defendant Keenan as Plaintiff's "account executive" and November 1991-June 1993, reflecting DiGiulio as Plaintiff's "investment executive"). Plaintiff also was familiar with Defendant DiGiulio on a personal basis, as DiGiulio was married at the time to Plaintiff's ex-wife. Plaintiff's Memorandum at 2, n. 2. The record does not reflect whether Plaintiff received notice from Defendant Schneider Securities of Defendant Keenan's or Defendant DiGiulio's 1992 and 1993 terminations, and, at least through June 1993, Plaintiff's Schneider Securities account statement continued to name Defendant DiGuilio as Plaintiff's "investment executive," a full two months after the effective date of DiGiulio's termination from Schneider. Plaintiff'sExhibit 1.
Plaintiff was introduced to Defendant WideCom Group, Inc., developer and marketer of wide-format fax machines capable of transmitting blueprints and engineering plans, through Defendant Schneider Securities in the summer of 1992.[1] Post-Trial Memorandum of Defendant, WideComGroup, Inc. at 2, 4-5 (noting that "Schneider Securities arranged for Mr. Tuli to make a presentation to potential investors. That presentation occurred at the hotel then known as the Inn at the Crossings in Warwick, Rhode Island in 1992") (hereinafter WideCom Memorandum). In an effort to raise capital for the company, WideCom had retained the services of Defendant Schneider Securities, as memorialized in a "letter of intent" dated February 6, 1992. Plaintiff's Exhibit 13. In the summer of 1992, Plaintiff attended the meeting arranged by Defendant Schneider Securities with other potential investors of WideCom at the Inn at the Crossings, where Suneet Tuli, Vice President of WideCom, presented information about the WideCom Group and its product. WideCom Memorandum at 1, 5 (asserting that "There were approximately a dozen people in attendance at the presentation made by Mr. Tuli that evening"). Also in attendance at this meeting were Defendants Keenan and DiGiulio. Plaintiff's Memorandum at 2 (referencing the 1992 meeting and stating that "DiGiulio and his associate Jack Keenan gave an introduction to WideCom to a group of seven or eight potential investors"); Defendant Schneider Securities, Inc.'sPost-Trial Memorandum at 5 (citing to Plaintiff's answer to Interrogatory 21 that "`Keenan and DiGiulio did tell me that they were working on behalf of WideCom . . . .'") (hereinafter Schneider SecuritiesMemorandum). At the time of this meeting, Defendant Keenan was not employed by Defendant Schneider Securities, but Defendant DiGiulio was so employed. Plaintiff's Exhibit 48 (Defendant Schneider Securities, Inc.'sResponse to Plaintiff's Request for Admission, Response to Request No. 2 and Response to Request No. 3).
i. 1992-1994 Transactions between Defendant DiGiulio Plaintiff
Five months after Defendant Keenan's termination from Schneider, and approximately ten months before Defendant DiGiulio's termination, on June 27, 1992, Plaintiff gave his first of three checks to Defendant DiGiulio, made payable to "Schneider Securities — WidCom [sic] Escrow Acct." in the amount of $25,000. Plaintiff's Exhibit 3 (June 27, 1992 check). Almost three months later, on September 21, 1992, Plaintiff provided another check to Defendant DiGiulio for $75,000, payable to "WidCom [sic] Escrow Acct." Plaintiff's Exhibit 4 (September 21, 1992 check). The final check given by Plaintiff to Defendant DiGiulio in the amount of $17,500 was dated June 20, 1994, over a year after Defendant DiGiulio left Schneider Securities, and made payable to "WydCom [sic] Escrow Account." Plaintiff's Exhibit 5 (June 20, 1994 check).[2]
Plaintiff received no documentation or receipts (other than his three checks) indicating the specifics pertaining to the number of WideCom shares allegedly purchased and for what price per share. Defendants Keenan and DiGiulio deposited the funds obtained from Plaintiff in Citizens Bank accounts, controlled by the individual Defendants.Defendant's Exhibits C P (copies of Citizens Bank account records, "Schneider WideCom Escrow Account, D/B/F Vincent R. DiGiulio" and "WideCom Escrow Account, D/B/F John F. Keenan"); Schneider SecuritiesMemorandum at 6 ("Keenan and DiGiulio opened a personal escrow account to accept checks for the Widecom [sic] private placement that they were promoting. . . . This account was not a Schneider account, and Keenan and DiGiulio were the only individuals who could access the account and its funds"); WideCom Memorandum at 24 ("The evidence further establishes that Keenan and DiGiulio were the only two who could withdraw money from the accounts or, write checks on those accounts").
On November 17, 1993, after both Defendant DiGiulio and Defendant Keenan had left their employment at Schneider Securities (and before Plaintiff had given Defendant DiGiulio the last of the three checks), Plaintiff and Defendant DiGiulio, acting on behalf of an "inside shareholder who currently owns Widecom [sic] shares," entered into two WideCom "share agreements," whereby Plaintiff purchased 65,000 and 5,000 shares prior to the initial public offering in exchange for consideration of $117,500 and $17,500 respectively. Plaintiff's Exhibits 6 7
(copies of "share agreements" between Plaintiff and the "inside shareholder" represented by Defendant DiGiulio).[3] Section III of these documents provides: "The parties agree that all prior oral and written agreements, if any, are integrated with and superseded by this agreement and no variation of the terms of this agreement can be permitted without the written amendment of this agreement as of the month and year first written." Id.
ii. Letter of Intent between Defendant Schneider Securities and Defendant WideCom
Back on February 6, 1992, just a few weeks after Defendant Keenan had left Schneider Securities and over a year before Defendant DiGiulio's termination of employment with Schneider, Defendant Schneider Securities and Defendant WideCom executed a "letter of intent" (also referred to as "the private placement document"), which set forth the terms and conditions relating to Schneider's proposed private placement of WideCom's securities through an offering whereby Schneider would act as the selling agent. Plaintiff's Exhibit 13 (reproducing the February 6, 1992 letter of intent between Defendant Schneider Securities and Defendant WideCom); see Plaintiff's Exhibit 14 (February 27, 1992 letter from Defendant DiGiulio to Suneet Tuli, representing Defendant WideCom, referring to letter of intent as "the private placement document"). Paragraph 7, relating the parties' "Statement of Intent," discloses the following:
 "It is understood that our undertaking to act as a selling agent for the offering is subject to the offering statement, all amendments contained therein and the documentation related thereto being satisfactory to [Schneider Securities, Inc.] and its counsel. . . . This document is a statement of intent. Its execution does not, either expressly or by implication constitute a binding agreement by [Schneider Securities, Inc.] to undertake the financing outlined above or an agreement to enter into a selling agreement, except as to your obligation to proceed with the selling outlined herein and except as set forth in paragraph 5, 6, and 8 hereof. Any legal obligations between the parties shall be only as set forth in a duly negotiated and executed offering agreement. . . ." Id. (emphasis added).
The letter of intent further contains a self-terminating clause, which provides that "In case dead line [sic] as in ¶ 6(g) is not met, this contract will be cancelled and only 10% as fee of the money raised plus expenses will be paid. In case no money is raised $5,000 will be refunded in full." Id. The deadline referenced in this clause indicates that "The time factor for raising money will be limited to 9 months from the date [Schneider Securities, Inc.] receives the signed private placement document." Id. (letter of intent at ¶ 6(g)).
After numerous correspondences between Defendant WideCom and Defendant Schneider Securities regarding revisions to the letter of intent, a March 18, 1992 communication from Lakhbir Singh Tuli, representing WideCom, to Thomas L. DePetrillo, representing Schneider Securities, indicates the completion of "all requirements to be provided by us under the contract."Plaintiff's Exhibit 18; Plaintiff's Exhibits 15-18 (copies of correspondences between February and March 1992 prior to completion of contract requirements). Thereafter, at some point in 1992, the letter of intent self-terminated by its terms as Defendant Schneider Securities failed to raise the requisite amount of money within the stated timeframe. See Plaintiff's Exhibit 36 (August 6, 1993 correspondence from Attorney Jeffrey M. Stoler to Attorney Christine Marks noting that "The Schneider office that was expected to handle the Company's offering subsequently closed, and Schneider failed to perform any services and the [February 1992] Schneider Agreement terminated by its terms").
iii. Marketing and Management Consulting Agreement Compensating Defendants DiGiulio and Keenan for Services Rendered to Defendant WideCom
On July 30, 1993, Defendants Keenan and DiGiulio entered into a Marketing and Management Consulting Agreement with Raja Singh Tuli, whereby the parties agreed that Defendants Keenan and DiGiulio would receive 125,000 of Tuli's individual WideCom shares for consulting services rendered to WideCom for a period of one year, from July 1, 1992 through June 30, 1993. Plaintiff's Exhibit 32 (copy of Marketing andManagement Consulting Agreement, Recitals ¶ 7 ("Whereas, WideCom's financial advisors believe that the issuance of new shares by WideCom to the Consultants could adversely affect WideCom's capital structure, Tuli has agreed to pay the amounts due to the Consultants by transferring some of his own shares of WideCom") Agreements § 2 ("Reasonable compensation for the Consultants' services for the period July 1, 1992 through June 30, 1993 is hereby agreed to be U.S. $162,450. Tuli hereby agrees to pay such compensation to the Consultants by transferring to them a total of 125,000 shares . . . of WideCom . . . .")).[4]
The consulting services attributed to Defendants DiGiulio and Keenan and compensated by the 125,000 shares included assistance provided to WideCom in the form of "(a) advising with regard to alternative business plans, management techniques and methods of capitalizing on the value of the Technologies, (b) introducing Tuli and other WideCom representatives to potential purchasers of WideCom's products, (c) attending trade shows to assist Tuli and other WideCom representatives in connection with introducing WideCom's products to the market, and (d) other services related to maximizing the market acceptance of the products." Id.
(Marketing and Management Consulting Agreement, Agreements § 1). The Agreement further provided that "[p]ursuant to the foregoing, the Consultants made themselves available to attend trade shows, acted in an introductory capacity, traveled frequently to Ontario, and provided marketing or management advice to Tuli by telephone or in person at various and frequent times as Tuli requested." Id.
iv. December 1995 Initial Public Offering (IPO)
After delays in the commencement of the WideCom initial public offering, in December 1995 the IPO finally occurred. Plaintiff'sMemorandum at 3, 5; WideCom Memorandum at 11. Thereafter, Plaintiff expected to receive his WideCom stock certificates and promissory notes.Plaintiff's Memorandum at 5 ("Prior to the IPO in December 1995, Carlsten was not concerned that he had not yet received his stock certificates, because DiGiulio had explained that the stock was restricted and could not be sold or transferred prior to the IPO and the notes were not due and payable until that time"). Having not received the certificates and notes after the IPO, Plaintiff contacted his attorney in July or August of 1996, commencing this action on March 24, 1997. Plaintiff'sMemorandum at 5; Plaintiff's Complaint.
 STANDARD OF REVIEW
Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . ." R.I. Sup. Ct. R.C. P. Rule 52(a) (2003). Pursuant to this authority, "[t]he trial justice sits as a trier of fact as well as of law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, he [or she] weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." Id. "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury" and "[i]t is also the province of the trial justice to draw inferences from the testimony of witnesses . . . ." Walton v. Baird, 433 A.2d 963, 964 (R.I. 1981); see also Rodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983) ("The question of who is to be believed is one for the trier of fact").
When rendering a decision in a non-jury trial, the Rhode Island Supreme Court has interpreted Rule 52(a) to mean that "[t]he trial justice need not engage in extensive analysis to comply with this requirement." Whitev. Le Clerc, 468 A.2d 289, 290 (R.I. 1983). Thus, "[e]ven brief findings will suffice as long as they address and resolve the controlling factual and legal issues." Id.
 RACKETEERING
Plaintiff argues that Defendants DiGiulio and Keenan have violated the Rhode Island Racketeer Influenced and Corrupt Organization Act (RICO), G.L. 1956 § 7-15-1, et seq. (2002), by maintaining, establishing or conducting an enterprise with funds obtained from Plaintiff by false pretenses, fraudulent conversion and/or stealing. Plaintiff's Memorandum
at 10-11. Neither Defendant DiGiulio nor Defendant Keenan has responded to this claim in either testimony or written memoranda pursuant to the exercise of their Fifth Amendment rights.
Rhode Island General Laws § 7-15-2(a) makes it unlawful for "any person who has knowingly received any income derived directly or indirectly from a racketeering activity . . . to directly or indirectly use or invest any part of that income, or the proceeds of that income in the acquisition of an interest in, or in the establishment or operation of any enterprise." G.L. 1956 § 7-15-2(a). Subsection (b) prohibits "any person through a racketeering activity . . . to directly or indirectly acquire or maintain any interest in or control of any enterprise." G.L. 1956 § 7-15-2(b). Under § 7-15-2(c), "[i]t is unlawful for any person employed by or associated with any enterprise to conduct or participate in the conduct of the affairs of the enterprise through racketeering activity . . . ." G.L. 1956 § 7-15-2(c). Thus, as the Rhode Island Supreme Court has noted, "the elements of a RICO offense are (1) the commission of one act of racketeering activity and (2) the use or investment of the proceeds of the racketeering activity in the establishment, conduct or operation of an enterprise." State v.Brown, 486 A.2d 595, 599 (R.I. 1985).
An "enterprise" for the purposes of Rhode Island's RICO statute "includes any sole proprietorship, partnership, corporation, association, or other legal entity" as well as "any union or group of individuals associated for a particular purpose although not a legal entity." G.L. 1956 § 7-15-1(a). Further, the statute defines "racketeering activity" as "any act or threat involving . . . larceny . . . ." G.L. 1956 § 7-15-1(c). The crime of larceny, in turn, encompasses stealing, fraudulent conversion and obtaining money by false pretenses. G.L. 1956 §§ 11-41-1 (2002) (stealing); 11-41-3 (2002) (fraudulent conversion); 11-41-4 (2002) (false pretenses).
Section 7-15-4(c) of the Rhode Island RICO statute provides a civil remedy for "[a]ny person injured in his or her business or property by reason of a violation of this chapter. . . ." G.L. 1956 § 7-15-4(c). A party who successfully proves his or her RICO claim under § 7-15-2
"shall recover treble damages and the cost of the suit, including a reasonable attorney's fee." G.L. 1956 § 7-15-4(c). Additionally, "[i]n order for an injured person to recover pursuant to this subsection, it is not necessary to show that the defendant has been convicted of a criminal violation of this chapter." G.L. 1956 §7-15-4(c). This provision mirrors the federal counterpart, and thus, "requires a similar analysis." Vitone v. Metropolitan Life Ins. Co.,943 F. Supp. 192, 200 (D.R.I. 1996).
In the present case, even assuming the existence of racketeering activity, no evidence presented at trial demonstrates that the individual Defendants utilized this money "in the establishment, conduct or operation of an enterprise." Brown, 486 A.2d at 599. Where a plaintiff fails to demonstrate the investment of income derived from racketeering activity in an enterprise pursuant to G.L. 1956 § 7-15-2(a), or fails to prove the acquisition or maintenance of an interest in an enterprise through racketeering activity pursuant to G.L. 1956 § 7-15-2(b), a RICO claim cannot lie. Compagnie De Reassurance D'Ile De Fr. v. New Eng.Reinsurance Corp., 57 F.3d 56, 91, 92 (1st Cir. 1995) (observing that "in proving a right to recover for a RICO violation premised upon § 1962(a), the plaintiffs had to prove that they were harmed by reason of [New England Reinsurance Corporation's] use or investment of income derived from a pattern of racketeering activity in some enterprise" and further noting that "[u]nder § 1962(b), the plaintiffs had to show that they were harmed by reason of [New England Reinsurance Corporation's] acquisition or maintenance of control of an enterprise through a pattern of racketeering activity . . . . even assuming that plaintiffs proved the underlying RICO violation, they failed to prove any harm beyond that resulting from the fraud which constituted the predicate act"); see Kirschner v. Cable/Tel Corp., 576 F. Supp. 234, 242 (E.D. Pa. 1983) (construing federal counterparts of Rhode Island RICO statute (18 U.S.C. § 1962(a), (b)) and noting that "under section 1962(a), plaintiffs would have to show that at least one of the defendants received income from . . . racketeering activity and used at least some of it, or the proceeds of it, in acquiring, establishing or operating an enterprise" and "under section 1962(b), plaintiffs would have to show that at least one of the defendants, through . . . racketeering activity, acquired or maintained an interest in the enterprise").[5]
Because Plaintiff has offered no evidence to indicate that he was "harmed by reason of [the individual Defendants'] use or investment of income derived from . . . racketeering activity" and further has failed to establish that he has been "harmed by reason of [Defendant Keenan's and Defendant DiGiulio's] acquisition or maintenance of control of an enterprise through . . . racketeering activity," his claims under subsections (a) and (b) of § 7-15-2 cannot succeed. Compagnie DeReassurance D'Ile De Fr., 57 F.3d at 91, 92.
Moreover, although Plaintiff summarily asserts that "DiGiulio and Keenan were individuals who were associated for the purposes of a private placement of WideCom stock" and that "[t]his constitutes an `enterprise' under RICO," Plaintiff has not succeeded in proving the existence of an enterprise distinct from the alleged racketeering activity. The United States Supreme Court has held that an "enterprise is an entity, . . . a group of persons associated together for a common purpose of engaging in a course of conduct . . . . [and] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette,452 U.S. 576, 583 (1981). Further,
 "[w]hile the proof used to establish [the existence of an enterprise and the existence of racketeering activity] may in particular cases coalesce, proof of one does not necessarily establish the other. The `enterprise' is not the `pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the [aggrieved party]." Id.; Libertad v. Welch, 53 F.3d 428, 441 (1st Cir. 1995).
Thus, in order to qualify as a RICO enterprise, the "enterprise must form an entity `separate and apart' from the pattern of racketeering activity with which it is charged." Lares Group, II v. Tobin, 47 F. Supp.2d 223, 229 (D.R.I. 1999), aff'd 221 F.3d 41 (1st Cir. 2000). Plaintiff has not proven that the alleged enterprise exists separately and apart from the racketeering activity in which the individual Defendants allegedly engaged. Turkette, 452 U.S. at 583; Libertad, 53 F.3d at 441; LaresGroup, II, 47 F. Supp.2d at 229, aff'd 221 F.3d 41 (1st Cir. 2000); seealso Feinstein v. Resolution Trust Corp., 942 F.2d 34, 41 n. 7 (1st Cir. 1991) (recognizing that "Although the complaint made a ritualistic averment, in wholly conclusory terms, that the defendants, including the appellees, `constitute[d] an enterprise ostensibly engaging in the business of buying, selling, mortgaging, hypothecating, exchanging and pledging certain properties . . . located in various states,' it contained no allegations articulating how any of the appellees may have comprised part of an `ongoing organization' or `functioned as a continuing unit' "). As such, Plaintiff's RICO claim under 7-15-2(c) also fails.
 BREACH OF CONTRACT
In Count II of his complaint, Plaintiff alleges that Defendant DiGiulio is guilty of breach of contract because he failed to deliver the stock certificates and promissory notes to Plaintiff. Plaintiff's Memorandum at 8. Pursuant to his assertion of his Fifth Amendment right, Defendant DiGiulio did not respond to this allegation, did not appear at trial, and failed to submit any legal papers to this Court.
In order to form a valid contract "there must be the mutual assent of two or more persons competent to contract, founded on a sufficient and legal consideration, to perform some legal act . . . ." 17A Am. Jur.2dContracts § 16 (1991). According to § 6A-8-319 of the Rhode Island General Laws, presently repealed, but effective at all times relevant to Plaintiff's supplying checks to Defendant DiGiulio between 1992 and 1994, "[a] contract for the sale of securities is not enforceable by way of action or defense" unless one of four conditions has been met. G.L. 1956 § 6A-8-319, repealed § 6A-8-133 (2000);accord Demirs v. Plexicraft, Inc., 781 F. Supp. 860, 863 (D.R.I. 1991) (observing that "if the agreement did constitute a sale of securities, it would fit within the parameters of the Statute of Frauds, and would thus be an unenforceable agreement (assuming the sale did not comply with subsection (a), (b), (c) or (d) of the Statute of Frauds as set forth [in G.L. 1956 § 6A-8-319]"). They are:
 "(a) There is some writing signed by the party against whom enforcement is sought or by his or her authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or
 (b) Delivery of a certified security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered and the transferee has failed to send written objection to the issuer within ten (10) days after receipt of the initial transaction statement confirming the registration, or payment has been made, but the contract is enforceable under this provision only to the extent of the delivery, registration, or payment;
 (c) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under subdivision (a) has been received by the party against whom enforcement is sought and he or she has failed to send a written objection to its contents within ten (10) days after its receipt; or
 (d) The party against whom enforcement is sought admits in his or her pleading, testimony, or otherwise in court that a contract was made for the sale of a stated quantity of described securities at a defined or stated price." G.L. 1956 § 6A-8-319, repealed by § 6A-8-133 (2000) (emphasis added).
The exception emphasized in subsection (b) applies to the present case as payment was rendered by Plaintiff to Defendant DiGiulio in June 1992 and September 1992. Plaintiff's Exhibit 3 (June 27, 1992 check); Plaintiff'sExhibit 4 (September 21, 1992 check). Accordingly, valid contracts for the sale of securities could at first blush be regarded as being formed on those dates.
However, the first check made out to "Schneider Securities — WidCom [sic] Escrow Acct." in the amount of $25,000, and the other check to Defendant DiGiulio for $75,000, payable to "WidCom [sic] Escrow Acct." constituted payments to escrow accounts. Accordingly, the first 1993 "share agreement" between Plaintiff and Defendant DiGiulio on behalf of an inside shareholder, whereby Plaintiff agreed to tender $117,500 in exchange for 65,000 shares of WideCom stock, constitutes a new binding contract in substitution of the older 1992 escrow agreements. Plaintiff'sExhibit 6. Where parties enter into "a new agreement to an older one, altering, canceling, supplementing, or supplanting the former contract," there must be some consideration supporting the new agreement. 17A Am. Jur.2d Contracts §§ 514, 515 ("a new consideration is essential to the substitution of one contract for another"); accord
Restatement (Second) Contracts § 279, cmt. c (noting that discharge of prior duties resulting from a substituted contract "is not effective unless it is supported by consideration or some substitute for consideration"); DeBois v. Boylston Tremonst Corp., 281 Mass. 498, 509, 183 N.E. 823, 827 (1933) ("a subsequent contract completely covering the same subject-matter, and made by the same parties, as an earlier agreement, but containing terms inconsistent with the former contract, so that the two cannot stand together, rescinds, substitutes, and is substituted for the earlier contract and becomes the only agreement of the parties on the subject. But the subsequent agreement must have sufficient consideration") (quoting Williston on Contracts § 1826). Sufficient consideration to support the first share agreement existed in the form of a required additional payment by Plaintiff in the amount of $17,500 for additional shares of WideCom stock. Therefore, the first share agreement superseded the prior 1992 contracts. Moreover, the first 1993 share agreement comports with the Statute of Frauds exception enunciated in G.L. 1956 § 6A-8-319(a), by enumerating the quantity of shares at a stated price and by being signed by Defendant DiGiulio, the party against whom enforcement is sought. Plaintiff's Exhibit 6 (copy of first share agreement). Thus, the extent of the individual Defendants' liability arises from the first 1993 share agreement, not from the 1992 contracts.
The second November 1993 share agreement wherein Plaintiff agreed to pay $17,500 in exchange for 5,000 shares of WideCom stock, also would constitute a valid contract for the sale of securities under subsection (a) of § 6A-8-319. G.L. 1956 § 6A-8-319; Plaintiff's Exhibit 7
(second share agreement). The document reveals a "stated quantity of described securities at a defined or stated price," namely, the purchase of "5000 shares of WideCom for a consideration of $17,500," and Defendant DiGiulio, the party against whom enforcement is sought, signed the agreement. G.L. 1956 § 6A-8-319; Plaintiff's Exhibit 7.
While it is unclear to which contract Plaintiff intended the June 1994 check for $17,500 to apply, Plaintiff's overall performance relating to the two share agreements totals $117,500. Plaintiff's Exhibit 5 (June 1994 check). Because valid contracts were formed upon the execution of the 1993 share agreements, and because Defendant DiGiulio has failed to perform by not delivering the stock certificates after the occurrence of the 1995 IPO in exchange for the $117,500 tendered by Plaintiff, a breach of contract has occurred. Restatement (Second) Contracts § 235(2) ("When performance of a duty under a contract is due any non-performance is a breach"). As such, Plaintiff is entitled to damages for breach of contract.
 FRAUD
Plaintiff contends that Defendant DiGiulio committed fraud against Plaintiff by representing to Plaintiff that Plaintiff would receive WideCom stock certificates and promissory notes in exchange for consideration in the amount of $117,500. Plaintiff's Memorandum at 9. Defendant DiGiulio did not rebut this allegation pursuant to the exercise of his Fifth Amendment right.
In order to establish a claim of fraud, a plaintiff must demonstrate that "the defendant `made a false representation intending thereby to induce plaintiff to rely thereon,' and that the plaintiff justifiably relied thereon to his or her damage." Zaino v. Zaino, 818 A.2d 630, 638 (R.I. 2003) (quoting Women's Dev. Corp. v. City of Central Falls,764 A.2d 151, 160 (R.I. 2001), quoting Travers v. Spidell, 682 A.2d 471, 472-73 (R.I. 1996)). Misrepresentation occurs upon "`any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts.'" Travers, 682 A.2d at 473 n. 1 (quoting Halpert v. Rosenthal,107 R.I. 406, 413, 267 A.2d 730, 734 (1970), (quoting RestatementContracts § 470 at 890-91)).
Clearly, Plaintiff relied to his detriment on Defendant DiGiulio's assertions that Plaintiff would receive stock certificates and promissory notes in exchange for financial consideration: Plaintiff has paid over one-hundred thousand dollars with no stock certificates or notes to show for it. Plaintiff's reliance on Defendant DiGiulio's assertions was justifiable in light of the tendering of the 1992 checks and the November 17, 1993 contracts for the sale of shares, executed between Plaintiff and Defendant DiGiulio, representing an "inside shareholder" of WideCom stock. Plaintiff's Exhibits 6 7 (copies of November 1993 share agreements). Further, Plaintiff's knowledge of Defendant DiGiulio in DiGiulio's capacity as a stockbroker and on a personal basis supports the reasonableness of Plaintiff's reliance on the reassurances by DiGiulio regarding delivery of the stock certificates and promissory notes after the IPO.
Moreover, the evidence reflects that Defendant DiGiulio made false representations to Plaintiff regarding the delivery of stock certificates and promissory notes with the intention of inducing Plaintiff's reliance on his assertions. In a civil action, a court may draw negative inferences from a defendant's refusal to testify pursuant to the exercise of his Fifth Amendment right. Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment `does not preclude the inference where the privilege is claimed by a party to a civilcause'") (quoting 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961)) (emphasis in original); FDIC v. Elio, 39 F.3d 1239, 1248 (1st Cir. 1994) (noting that in a civil action "the district court was entitled to draw a negative inference from [the defendant's] refusal to testify"); Tarro v.Tarro, 485 A.2d 558, 562 (R.I. 1984) (acknowledging that negative inferences may be drawn in civil cases as a result of a party's invocation of Fifth Amendment right); Pulawski v. Pulawski, 463 A.2d 151, 157 (R.I. 1983) (referencing Baxter and other state and federal cases, and noting that "We are of the opinion that the imposition of sanctions in a civil action upon one who refuses to answer questions relating to the subject matter in issue on the ground of self-incrimination is not a violation of any right guaranteed by the Fifth Amendment to the Constitution of the United States or article I, section 13 of the Rhode Island Constitution"). Defendant DiGiulio has neither defended himself against Plaintiff's fraud charges, nor offered any evidence to undercut Plaintiff's allegations. From Defendant DiGiulio's failure to testify at trial pursuant to his Fifth Amendment right, this Court draws a negative inference that DiGiulio, in fact, engaged in misrepresentations to Plaintiff.
Thus, with the evidence presented at trial, Plaintiff's credible testimony and Defendant DiGiulio's noticeable silence, this Court finds that DiGiulio made the assurances to Plaintiff about the delivery of the documents, not intending to deliver the certificates and notes to which Plaintiff was entitled pursuant to the November 1993 contracts. Accordingly, this Court finds that Plaintiff has proven his fraud claim as to Defendant DiGiulio.
 CONVERSION
Plaintiff alleges that Defendant DiGiulio unlawfully converted Plaintiff's stock certificates and promissory notes because after the December 1995 IPO, and upon Plaintiff's demand for those items, Defendant DiGiulio refused to provide the documents. Plaintiff's Memorandum at 7. Defendant DiGiulio has offered no legal memorandum responding to these allegations, and he did not appear at trial pursuant to his invocation of his Fifth Amendment right.
The Restatement (Second) of Torts defines conversion as "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) Torts § 222A. Thus, the Rhode Island Supreme Court has held that "`[t]he gravamen of an action for conversion lies in the defendant's taking the plaintiff's personalty without consent and exercising dominion over it inconsistent with the plaintiff's right to possession.'" DeChristofaro v. Machala, 685 A.2d 258, 262 (R.I. 1996) (quoting Fuscellaro v. Industrial Nat'l Corp., 117 R.I. 558, 560,368 A.2d 1227, 1230 (1977)). Accordingly, "[t]he focus of inquiry is `whether [a] defendant has appropriated to his [or her] own use the chattel of another without the latter's permission and without legal right.'" Id. (quoting Terrien v. Joseph, 73 R.I. 112, 115, 53 A.2d 923, 925 (1947)).
Conversion may occur when one refuses to surrender or deliver property on demand by the person entitled to its immediate possession. Restatement (Second) Torts §§ 223, 237 ("One in possession of a chattel as bailee or otherwise who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession, is subject to liability for its conversion"). Non-delivery of such property as stock certificates and promissory notes may be the subject of a conversion action. Montecalvo v. Mandarelli, 682 A.2d 918, 928-29 (R.I. 1996) (holding that "we are of the opinion that a conversion action will not lie for a partnership interest or other intangible property right that is not manifested by a tangible instrument, such as a written agreement, a bankbook, or a promissory note, that may, in turn, be converted" and collecting cases permitting conversion claim for promissory notes and stock certificates); 18 Am. Jur.2d Conversion § 13 ("An action may be maintained for the conversion of a written instrument"), § 14 ("An action may be maintained for the conversion of corporate stock, even for unissued stock certificates"); see also Emery-Waterhouse Co. v. RhodeIsland Hospital Trust Nat'l Bank, 757 F.2d 399, 407 (1st Cir. 1985) (citing to W. Prosser W.P. Keeton, The Law of Torts § 15 at 91 (1984 ed.) and noting the expansion of conversion actions to less tangible property such as checks, promissory notes, and stock certificates)).
In the present case, Defendant DiGiulio appears rightfully to have been in possession of Plaintiff's chattel-the stock certificates or the money for same-up until the December 1995 IPO, whereupon Plaintiff demanded the delivery of the documents representing the money Plaintiff had tendered.Plaintiff's Memorandum at 7 (acknowledging that "although DiGiulio was initially in rightful possession of Carlsten's stock certificates and promissory notes, Carlsten later demanded that he be given his property, yet his demand was refused and his certificates and notes were never delivered"). Because Defendant DiGiulio did not deliver Plaintiff's stock certificates, or in the alternative, money, upon Plaintiff's 1996 demand, has not delivered the documents or funds to date and has not offered any explanation for the non-delivery and continued possession without Plaintiff's consent and inconsistent with Plaintiff's right to possession, this Court finds that Plaintiff successfully has proven his claim of conversion against Defendant DiGiulio. Baxter, 425 U.S. at 318 (a court may draw negative inferences in a civil case against a party who refuses to testify pursuant to invocation of Fifth Amendment right);Elio, 39 F.3d at 1248; see Tarro, 485 A.2d at 562; Pulawski, 463 A.2d at 157.
 VICARIOUS LIABILITY
In order for a principal to be vicariously liable for the acts of its agent, the agent must have acted with actual authority, apparent authority or within the agent's inherent powers. Marya v. Slakey,190 F. Supp.2d 95, 101 (D.Mass. 2001) ("Vicarious liability may rest upon the existence of either an actual or an apparent agency relationship"); Restatement (Second) Agency § 257 ("A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal"). Where such authority exists, a principal may be vicariously liable for the acts of its agent pertaining to breach of contract, fraud, conversion and certain violations of RICO. See Schultz v. Commodity Futures Trading Com.,716 F.2d 136, 141 (2d Cir. 1983) (conversion); Federal Sav. LoanIns. Corp. v. Shearson-American Express, Inc., 658 F. Supp. 1331, 1338, 1341-42 (D.P.R. 1987) (discussing fraud claim under theory of respondeat superior and observing "the trend of the law . . . generally holds that normal doctrines of corporate liability, such as vicarious liability, apply under RICO); Menard Co. Masonry Bldg. Contractors v. MarshallBldg. Sys., 539 A.2d 523, 526 (R.I. 1988) (noting that an agent may bind principal to contract thereby creating liability on behalf of principal). The First Circuit has foreclosed actions for vicarious liability under § 1962(c) of the federal RICO statute. Schofield v. First CommodityCorp. of Boston, 793 F.2d 28, 32-34 (1st Cir. 1986).
 Actual Authority
The Restatement (Second) Agency defines actual authority as "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) Agency § 7 (1958). Actual authority arises upon "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Id. at § 26. Further, "[t]he manifestations to the agent can be made by the principal directly, or by any means intended to cause the agent to believe that he is authorized or which the principal should realize will cause such belief." Id. at § 26, cmt. b. Termination of actual authority may be accomplished in a number of ways, including when "the principal or the agent manifests to the other dissent to its continuance." Id. at § 118.
 Apparent Authority
In contrast, apparent authority encompasses "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."[6] Id. at § 8;Parrillo v. Chalk, 681 A.2d 916, 919 (R.I. 1996) (quoting § 8 of the Restatement (Second) Agency). A principal creates apparent authority in an agent as to a third person "by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second)Agency § 27; 731 Airport Assocs., LP v. H M Realty Assocs.,LLC, 799 A.2d 279, 283 (R.I. 2002) (noting that "apparent authority can come from `indicia of authority given by the principal to the agent' and does not have to be direct communication to the third person"); Parillo,
681 A.2d at 919 (observing that "to create [apparent] authority, the principal . . . must manifest to the third party . . . that he or she `consents to have the act done on his [or her] behalf by the person purporting to act for him [or her]'") (quoting Restatement (Second)Agency § 27)).
Thus, it is the actions of the principal, not the agent, which give rise to the existence of apparent authority. 731 Airport Assocs., 799 A.2d at 283 ("Apparent authority to contract on behalf of a principal `arises from the principal's manifestation of such authority to the [third party]'") (quoting Menard Co. Masonry Building Contractorsv. Marshall Building Sys., Inc., 539 A.2d 523, 526 (R.I. 1988)); Restatement (Second) Agency § 159, cmt. b ("the principal is affected by apparent authority only as to those who rely upon conduct of the principal which causes them to believe that the `agent' is authorized"). In addition, the "the third party with whom the agent is dealing must `believe that the agent has the authority to bind its principal to the contract.'" 731 Airport Assocs., 799 A.2d at 283. To this end, the Rhode Island Supreme Court has noted that
 "[t]o establish the apparent authority of an agent to do a certain act, facts must be shown that the principal has manifestly consented to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; that a third person knew of the fact and, acting in good faith had reason to believe and did actually believe that the agent possessed such authority; and that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal." Calenda v. Allstate Ins. Co., 518 A.2d 624, 628 (R.I. 1986) (quoting Soar v. Nat'l Football League Players Ass'n, 438 F. Supp. 337, 342 (D.R.I. 1975) aff'd 550 F.2d 1287
(1st Cir. 1977)).
If apparent authority exists, it may continue even after the termination of the agent's authority. Restatement (Second) Agency § 124A, cmt. a. Thus, "[i]f there was apparent authority previously, its existence is unaffected until the knowledge or notice of the termination of authority comes to the third person . . . ." Id. Likewise, "[i]f before the termination of authority, there was no apparent authority, there is none afterwards." Id. Termination of an agent's apparent authority occurs "when the third person has notice of: (a) the termination of the agent's authority [or] (b) a manifestation by the principal that he no longer consents." Id. at § 125. In turn, the Restatement (Second) Agency defines "notice of termination of authority" as when the third party "knows, has reason to know, should know, or has been given a notification of the occurrence of an event from which, if reasonable, he would draw the inference that the principal does not consent to have the agent so act for him . . . ." Restatement (Second)Agency § 135.
 Inherent Powers of Agent
The inherent agency power is "the power of an agent to bind the principal by acts performed and transactions conducted by him during the duration of his relationship to the principal but for which he has no authority and may have no apparent authority." Harold Gill Reuschlein William A. Gregory, Agency and Partnership § 46(A) (1979) (hereinafter Agency and Partnership). Unlike apparent authority, "the agent's inherent agency powers will terminate immediately" upon the termination of actual authority. Id.; accord Restatement (Second) Agency
§ 124A, cmt. b (noting that inherent powers of agent "terminate upon the termination of the agency relation").
A. Defendant Schneider Securities
Plaintiff alleges that under the theory of respondeat superior,
liability for the misdeeds of Defendants DiGiulio and Keenan attaches to Defendant Schneider Securities. Plaintiff's Memorandum at 25-30. Defendant Schneider Securities disputes this contention, arguing that the individual Defendants acted independently of Schneider Securities when they contracted with Plaintiff in November 1993 and at all times when they solicited and obtained money from Plaintiff. Schneider SecuritiesMemorandum at 2. Further, that Defendants DiGiulio and Keenan deposited Plaintiff's funds into an account maintained by the individual Defendants, and not by Schneider, negates Plaintiff's claim of imputed liability to Defendant Schneider Securities, as does the fact that the funds/purchases of WideCom stock never appeared on any of Plaintiff's Schneider Securities account statements. Id.
It is undisputed that Defendant Schneider Securities did not employ Defendants DiGiulio and Keenan at the time Defendant DiGiulio and Plaintiff executed the share agreements in November 1993. Plaintiff'sExhibits 6 7 (copies of share agreements between Plaintiff and the "inside shareholder" represented by Defendant DiGiulio); Plaintiff'sExhibit 48 (Defendant Schneider Securities, Inc.'s Response toPlaintiff's Request for Admission, Response to Request No. 2 
Response to Request No. 3). Accordingly, any actual authority once possessed by Defendants Keenan and DiGiulio to act on behalf of Defendant Schneider Securities in the sale of stock terminated upon their departure from Schneider in January 1992 and April 1993 respectively, well before the execution of the November 17, 1993 share agreements with Plaintiff.Plaintiff's Exhibit 7; Plaintiff's Exhibit 48. Because Defendants Keenan and DiGiulio did not possess actual authority to act on behalf of Schneider in November 1993, and because the individual Defendants' inherent agency powers ended upon the termination of their actual authority, Defendant Schneider Securities cannot be vicariously liable for the individual Defendants' actions with respect to the share agreements under these agency theories. Plaintiff's Exhibit 7;Plaintiff's Exhibit 48; Restatement (Second) Agency § 118; Agency andPartnership § 46A.
Further, the evidence does not demonstrate that Defendant Schneider Securities created apparent authority in the individual Defendants to Plaintiff which would attach to the November 1993 agreements. The evidence presented at trial does not demonstrate that Defendant Schneider Securities manifested to Plaintiff the authority of the individual Defendants to sell WideCom stock. Plaintiff's Schneider Securities account statements do not reflect any activity relating to the purchase of WideCom shares. Plaintiff's Exhibit 1 (Plaintiff's Schneider Securities account statements August 1991-June 1993). Further, the November 1993 contracts contain no indication of involvement by Defendant Schneider Securities, and no evidence demonstrates that Schneider's actions, words or other conduct led Plaintiff to believe that it authorized the individual Defendants to sell WideCom shares on Schneider's behalf. Plaintiff's Exhibits 6 7 (copies of share agreements).
Moreover, Plaintiff testified that he did not intend to purchase the WideCom stock through his accounts at Schneider and stated that, from the 1992 meeting at the Inn at the Crossings, he believed that "Keenan and DiGiulio were working on behalf of WideCom" based on the actions of the individual Defendants and Suneet Tuli. Schneider Securities Memorandum at 4, 5; Plaintiff's Supplemental Answers to WideCom's Interrogatories at Answers 5, 21 (filed November 27, 2002) ("Keenan, DiGiulio, and I had a meeting at the Inn at the Crossings in Warwick, Rhode Island, with Suneet from WideCom. He confirmed that Keenan and DiGiulio were working on behalf of WideCom . . . ."). Thus, from this evidence, it cannot be said that Plaintiff "had reason to believe and did actually believe that [Defendants DiGiulio and Keenan] possessed [apparent] authority" to act on behalf of Defendant Schneider Securities with respect to the share agreements. Calenda, 518 A.2d at 628. Because Plaintiff did not have reason to believe and did not believe that the individual Defendants were acting on behalf of Schneider Securities when transacting with Plaintiff in November 1993, liability cannot be imputed to Schneider as to the share agreements on a theory of apparent authority. Id.
B. Defendant WideCom
Asserting that Defendant WideCom actually and/or apparently authorized Defendants DiGiulio and Keenan to sell WideCom stock and notes, Plaintiff argues that Defendant WideCom is vicariously liable for the individual Defendants' misconduct. Plaintiff's Memorandum at 19-24. Further, Plaintiff contends, selling stock was within Defendant DiGiulio's and Defendant Keenan's power as agents of Defendant WideCom, therefore imputing liability to WideCom. Id. at 24. Defendant WideCom counters Plaintiff's allegations, urging that no contract and no agency relationship existed between itself and Plaintiff. WideCom Memorandum at 2.
Clearly, between July 1, 1992 through June 30, 1993, Defendant WideCom had actually authorized Defendants DiGiulio and Keenan to perform certain functions on behalf of WideCom, as memorialized in the July 30, 1993 Marketing and Management Consulting Agreement. Plaintiff's Exhibit 32
(Marketing and Management Consulting Agreement). However, the evidence does not suggest that Defendant WideCom gave Defendants Keenan and DiGiulio actual authority to sell WideCom stock at any point thereafter.See Plaintiff's Exhibit 31 (June 20, 1993 letter from Suneet Tuli, Executive Vice President of WideCom, to James Quatrocchi asserting that "effective June 20th, 1993, Mr. Jack Keenan is no longer associated with the WideCom Group, Inc."). As such, the evidence reflects that the individual Defendants lacked the actual authority to sell WideCom shares to Plaintiff during the November 1993 execution of the contracts between Plaintiff and Defendant DiGiulio. Thus, Defendant WideCom cannot be vicariously liable for the acts of Defendant DiGiulio relating to the 1993 share agreements under the theory of actual authority or the inherent powers of the agent.
However, Defendant DiGiulio possessed the apparent authority to execute the 1993 share agreements on WideCom's behalf. At the summer 1992 meeting at the Inn at the Crossings, where Plaintiff met with the individual Defendants and Suneet Tuli, representing Defendant WideCom, Plaintiff testified that Tuli "confirmed that Keenan and DiGiulio were working on behalf of WideCom." Plaintiff's Supplemental Answers to WideCom'sInterrogatories at Answers 5, 21 (filed November 27, 2002). No evidence presented at trial demonstrates that WideCom behaved in any manner inconsistent with this representation or shows that Defendant WideCom manifested to Plaintiff any termination of authority. Additionally, there is no indication that Plaintiff actually knew, had reason to know, or had been notified of the occurrence of any event which would lead Plaintiff to conclude that WideCom no longer consented to the actions of the individual Defendants on WideCom's behalf. Restatement (Second) Agency
§ 135. Accordingly, Defendant WideCom is liable to Plaintiff for the damage sustained by Defendant DiGiulio's breach of contract, fraud, and conversion stemming from the 1993 contracts.
 DAMAGES
A. Breach of Contract/Conversion
The measure of damages for breach of contract is well settled in Rhode Island. George v. George F. Berkander, Inc., 92 R.I. 426, 430,169 A.2d 370, 372 (1961). It consists of "an application of such measures of damage as will serve to put the injured party as close as is reasonably possible to the position he would have been in had the contract been fully performed." Id.
As for conversion, "[c]ustomarily the measure of damages . . . is the fair market value of the property at the time of the conversion."Goodbody Co. v. Parente, 116 R.I. 437, 440 n. 2, 358 A.2d 32, 33 n. 2 (1976) (citing Jeffrey v. American Screw Co., 98 R.I. 286, 291,201 A.2d 146, 150 (1964)). However, the Rhode Island Supreme Court has noted that "[w]hen the property converted is of fluctuating value . . . damages may be measured differently." Id. (citing 1 Harper James, Torts § 2.38 (1956)). To this end, "the measure of damages for wrongful conversion of stock is either (1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired, whichever of (1) or (2) is higher." Schultz v. Commodity Futures Trading Com., 716 F.2d 136, 141 (2d Cir. 1983).
The evidence adduced at trial, indicates that Plaintiff had knowledge of the conversion of his shares in June 1996. Plaintiff concedes that due to a "reverse split" in the WideCom stock prior to the December 1995 IPO, Plaintiff in fact had only 48,442 shares. Plaintiff's Memorandum at 15. Because the measure of damages for breach of contract and for conversion is the same in an action for non-delivery of stock certificates, Plaintiff is entitled to compensatory damages in the amount of $593,414.50 (48,442 shares x $12.25/share). Fifth Nat'l Bank v.Providence Warehouse Co., 17 R.I. 112, 118, 20 A. 203 (1890) (referencing plaintiff's breach of contract and conversion claims and noting that "The rule of damages should be substantially the same in either form of action"); accord George v. Coolidge Bank Trust Co., 360 Mass. 635, 641, 277 N.E.2d 278, 283 (1971) ("In an action for damages for the conversion of stock, or for breach of a contract to deliver stock, the measure of damages is the fair market value at the time of conversion or failure to deliver, with interest"); see Siedlecki v. Powell,36 N.C. App. 690, 694, 245 S.E.2d 417, 420 (1978).
i. Prejudgment Interest
Section 9-21-10(a) of the Rhode Island
 General Laws provides that "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein." G.L. 1956 § 9-21-10 (2002).
Accordingly, Plaintiff is entitled to prejudgment interest at 12% per annum from the time his cause of action accrued in June 1996 to the entry of this judgment. Id.
ii. Attorney's Fees
Pursuant to § 9-1-45 of the Rhode Island General Laws, a trial justice "may award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court: (1) Finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party." G.L. 1956 § 9-1-45
(2002). "It is well settled that the award of attorney's fees rests within the discretion of the trial justice." Greensleeves, Inc. v.Smiley, 754 A.2d 102, 103 (R.I. 2000). In the present case, a justiciable issue was raised by Defendant WideCom, and accordingly, an award of attorney's fees is not proper.
With respect to the Plaintiff's claim of damages in the amount of the four promissory notes, plus 12% interest, Plaintiff is not entitled to these sums because the two binding 1993 share agreements call for only an exchange of WideCom shares "in the form of a stock certificate" at $3.50/share for financial consideration. Plaintiff's Exhibits 6 7.
Because these binding contracts make no reference to any promissory notes, Plaintiff is not entitled to an award representing the notes and any accrued interest. Plaintiff's Exhibits 6 7.
B. Punitive Damages
"The nature of punitive or exemplary damages is twofold: to punish the tortfeasor whose wrongful conduct was malicious or intentional and to deter him or her and others from similar extreme conduct." Zarrella v.Minnesota Mutual Life Insurance Co., 2003 R.I. LEXIS 106, *29 (quotingPalmisano v. Toth, 624 A.2d 314, 317-18 (R.I. 1993)). The Rhode Island Supreme Court has held that "punitive damages are severely restricted under Rhode Island law," and has observed that this "rigorous" standard "will be satisfied only in instances wherein a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages." Mark v. Congregation Mishkon Tefiloh,745 A.2d 777, 779 (R.I. 2000) (quoting Palmisano v. Toth, 624 A.2d 314, 317-18 (R.I. 1993)). Further, "[t]he party seeking punitive damages has the burden of producing `evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amounts to criminality, which for the good of society and warning to the individual, ought to be punished.'" Zarella, 2003 R.I. LEXIS at *29 (quoting Palmisano v. Toth, 624 A.2d 314, 317-18 (R.I. 1993)).
Punitive damages are not available in contract actions "absent the most egregious circumstances. . . ." O'Coin v. Woonsocket Inst. Trust Co.,535 A.2d 1263, 1266 (R.I. 1988). Though the instant breach is here accompanied by fraud, the plaintiff has still not demonstrated that said fraud occurred at the inception of the contract to warrant a finding of the requisite malicious and intentional wrongful conduct warranting punitive damages. See 22 Am. Jur.2d Damages § 754. Accordingly, as this Court finds that Plaintiff has not met the rigorous burden of establishing "`evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amounts to criminality,'" it denies punitive damages.
 CONCLUSION
Counsel shall prepare the appropriate order and the appropriate judgment for entry.
[1] Defendant WideCom had organized in 1990 in Canada. Post-TrialMemorandum of Defendant, WideCom Group, Inc. at 2.
[2] Plaintiff acknowledges that he did not write or sign the June 20, 1994 check, but admits that he directed a member of his staff to do so. Plaintiff's Memorandum at 3-4.
[3] This contract between Plaintiff and the "inside shareholder" represented by Defendant DiGiulio occurred after Defendant DiGiulio had acquired 125,000 shares of WideCom stock as compensation for services rendered to WideCom from July 1992 through June 1993. See infra, Section iii. Marketing and Management Consulting Agreement between DefendantsDiGiulio and Keenan Defendant WideCom.
[4] The Marketing and Management Consulting Agreement names Vincent DiGiulio and John J. Keenan collectively as the "Consultants."Plaintiff's Exhibit 32.
[5] The Rhode Island RICO statute differs from its federal counterpart in that the Rhode Island law does not contain the language "from apattern of racketeering activity," but instead only requires one act of racketeering activity. G.L. 1956 § 7-15-2(a)-(c). Accordingly, the inapplicable language has been omitted from the preceding quotations.
[6] Actual authority and apparent authority "may exist concurrently or there may be one and not the other." Restatement (Second) Agency § 124A, cmt. a.