**FIRST DIVISION
DOYLE, C. J.,
PHIPPS, P. J, and BOGGS, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**November 13, 2015**

# In the Court of Appeals of Georgia

A15A0862. STEWART v. MCDONALD.                    DO-041

DOYLE, Chief Judge.

This case arises from claims for violations of the Georgia Fair Housing Act ("the Act"),[1] breach of professional duty under the Brokerage Relationships in Real Estate Transactions Act,[2] and intentional infliction of emotional distress,[3] filed by Brandon Stewart against the real estate agent who represented the seller from whom

---

[1] OCGA § 8-3-200 et seq.

[2] OCGA § 10-6A-5 (a) (4).

[3] Although Stewart's claims for breach of professional duty and intentional infliction of emotional distress were voluntarily dismissed, the trial court addressed them its order granting summary judgment to McDonald. Regardless, because Stewart enumerates error only as to the grant of summary judgment regarding the violations of the Act, we do not address the portion of the trial court's order dealing with those other claims.

he purchased a home. After the appellee filed a motion for summary judgment on the claim arising under the Act, the trial court granted the motion. For the reasons that follow, we affirm.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. On appeal from the grant or denial of a motion for summary judgment, we review the evidence de novo, and all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the nonmovant.[4]

On March 13, 2013, Stewart, an African-American male, entered into a real estate contract to purchase property for $370,000 ($20,000 over the asking price, but with the seller paying $8,000 in closing costs) from Brad Goldman and his wife; Stewart's was the highest of three offers on the table as of March 10, 2013. Prior to the contract being signed, neither Goldman nor his real estate agent, Collette McDonald, had met Stewart. On March 17, 2013, however, Stewart was driving past the property and met Goldman, and thereafter, Goldman spoke about the meeting to McDonald; he averred that he could not recall whether or not he told McDonald that

---

[4] (Citations and punctuation omitted.) *Bailey v. Stonecrest Condo. Assn.*, 304 Ga. App. 484 (696 SE2d 462) (2010).

2

Stewart was African-American. McDonald deposed that Goldman did not mention Stewart's race.

Prior to closing but after the March 17 meeting, Stewart gathered homeowner's insurance quotes, and he discovered the property was not insurable without the addition of a four-foot high fence around the property swimming pool. On March 25, Stewart's agent, Patricia Berholtz, contacted McDonald about the issue, and the following exchange occurred:

Berholtz: We are having a problem getting insurance on the house due to the pool fence not being 4 feet . . .

McDonald: I'm on it. I'll get back to you asap.

Berholtz: Thank you[.] Nothing is easy[.]

McDonald: Seriously! I'm wondering if we can just transfer the current home owners policy. Not that it would answer all the issues but it would help.

Berholtz: Who is it with[?] If it is the GA law now that the fence has to be 4 ft out of the ground[], I don't think that would work.

McDonald: I got an idea. . . . let's put barbed wire on the top of the fence and pretend we are in South Africa [laugh out loud]. We'll have to figure this one out for sure.

Berholtz did not disclose the last email to Stewart immediately because she believed it to be a racial slur against Stewart, and she was shocked and highly offended.

Eventually, Goldman agreed to remove the old fence and replace it with a code compliant fence. And shortly thereafter, Stewart's inspector completed his inspection and discovered water leaking into the foundation and mold in the house. Despite the fact that this normally is a repair that a seller will complete, McDonald responded on behalf of Goldman that he would not assist with repairs or complete them himself, however, he would pay $3,200 toward repairs. McDonald threatened that Goldman would cancel the contract and move on to another buyer in the event that this agreement was not acceptable to Stewart.

Another issue arose when the appraisal of the home established a market value of $5,000 less than the contract price. Berholtz sent to Goldman via McDonald an amended sales contract with the reduced sales price of $365,000 in order to comply with the appraisal, but McDonald returned to Stewart a different amended contract, which included (in addition to the reduced sales price) a reduction in the amount of

4

closing costs paid by Goldman; McDonald threatened that the sale would be terminated if Stewart disagreed with the reduction.

Because of the change in seller-paid closing costs, Stewart wanted to reduce the overall closing costs due by $3,000 by using his mortgage lender's preferred closing attorney. In response to the request to use a specific closing attorney instead of the closing attorney normally used by McDonald, she refused, stating, "Deal breaker. We are done here unless [Stewart] gets off this. We are using [our preferred closing attorney]." Berholtz complained to McDonald's supervising broker, asking for assistance getting the closing completed. McDonald was reprimanded by the broker, and the closing proceeded using the mortgage lender's preferred closing attorney as Stewart had requested. Berholtz averred that she had never experienced having the issue of a specific closing attorney be a "deal killer" as McDonald had threatened it would be.

After this, McDonald requested that the closing be split so that she and Goldman did not have to be there simultaneously with Stewart and Berholtz. Stewart, however, arrived while McDonald and Goldman were still at the closing, but instead of staying in the same room with him, McDonald took Goldman to a separate room. McDonald later re-entered the closing room, demanding checks for Goldman and

herself, but due to McDonald's own request for a wire transfer of the funds, the closing attorney had not prepared checks; the transfers were delayed because McDonald had failed to provide instructions prior to the closing. After closing but prior to completion of the transfer, McDonald refused to provide keys to Stewart. Finally, Berholtz requested transmission of the termite letter from Goldman, who had so agreed in the sales contract but had never provided it, and McDonald instructed Goldman that he was not obligated to do so because the closing had extinguished all unfulfilled contingencies in the sales contract.

Shortly before the closing, Stewart's agent told him about the South Africa comment from McDonald's March 25 email, which caused him upset, shock, hurt, sadness, and anger. Stewart reasoned that because McDonald lived in the same neighborhood as the Goldman property, her statement and actions regarding the post-contract issues and closing were a targeted attempt to prevent the sale based on his race. Stewart's agent agreed that she seemed to be going out of her way to prevent the sale, and he noted that her confrontational behavior and threats to terminate arose immediately after Stewart's meeting with Goldman at which point she could have learned his race.

As a result of McDonald's comment and behavior, Stewart claimed to have suffered lost wages due to lack of focus and concentration at work, difficulty sleeping, and worry about not being welcome in the neighborhood in which both McDonald and Goldman continue to reside.

Stewart filed suit against McDonald, and the trial court granted summary judgment to McDonald, finding that (1) Stewart failed to show that McDonald's conduct was racially motivated, and (2) Stewart had not suffered a distinct, palpable injury.[5] Under each of the three subsections of the Act under which Stewart has asserted injury, the trial court held that he had failed to show McDonald's conduct was discriminatory because (1) there was no evidence McDonald knew Stewart's race; (2) the message related to the fence was not a racist statement or evidence of

---

[5] We note that the trial court's order did not contain a recitation of the burden-shifting framework generally used when allegations of circumstantial evidence of discrimination arise. See, e.g., *Bailey*, 304 Ga. App. at 488 (1) ("Claims based on circumstantial evidence are subject to a burden-shifting analysis that was first developed by the United States Supreme Court for employment discrimination cases in *McDonnell Douglas Corp. v. Green*[, 411 U. S. 792 (93 SCt 1817, 36 LE2d 668) (1973)]."). Nevertheless, we presume that the trial court understood and applied the correct law unless the plaintiff shows otherwise. See *Infinite Energy, Inc. v. Ga. Public Svc. Commission*, 257 Ga. App. 757, 759 (1) (572 SE2d 91) (2002) ("'The trial judge is presumed to know the law and presumed to faithfully and lawfully perform the duties devolving upon it by law. This [C]ourt will not presume the trial court committed error where that fact does not affirmatively appear.'").

racial animus; (3) McDonald's actions threatening to kill the deal were reasonable negotiations; (4) McDonald's refusal to give Stewart the keys at closing "was . . . prudent"; and (5) the failure of Goldman to provide the termite letter could not "be tied to any discriminatory conduct by McDonald."

1. Stewart argues that the trial court erred by finding that he failed to show that McDonald's conduct and statement was discriminatory.

"The [Act], which is nearly identical to the Federal Fair Housing Act ("FHA"), allows aggrieved persons to seek actual and punitive damages for violations of the Act."[6] "Given that the . . . Act and the FHA are nearly identical, we consider federal cases construing the FHA persuasive precedent applicable to the instant dispute."[7] Under the Act,

> . . . it shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale . . . of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ; [or t]o make, print, or publish or cause to be made, printed, or published any notice, [or] statement . . . with respect to the sale . . . of a dwelling, that indicates any preference, limitation, or discrimination

---

[6] (Footnotes and punctuation omitted.) *Bailey*, 304 Ga. App. at 487 (1). See OCGA § 8-3-217.

[7] *Bailey*, 304 Ga. App. at 487, n.3.

based on race . . . or an intention to make any such preference, limitation, or discrimination.[8]

Additionally, "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate related transactions to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction because of race . . . ."[9] And "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of such person's having exercised or enjoyed . . . any right granted or protected by this article."[10]

We apply Title VII discrimination analysis in examining Fair Housing Act discrimination claims. A plaintiff can establish a FHA discrimination claim under a theory of disparate treatment or disparate impact. To bring a disparate treatment claim, the plaintiff must first establish a prima facie case. Adapted to this situation, the prima facie case elements are: (1) plaintiff's rights are protected under the FHA; and (2) as a result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury. Establishing the prima facie case affords the plaintiff a presumption of discrimination. This test does not

---

[8] OCGA § 8-3-202 (a) (2), (a) (3).

[9] OCGA § 8-3-204 (b).

[10] OCGA § 8-3-222.

9

permit the court to consider rebuttal evidence at the prima facie case stage. After the plaintiff has established the prima facie case, the burden then must shift to the defendant to articulate some legitimate, nondiscriminatory reason for the action. To accomplish this, the defendant is only required to set forth a legally sufficient explanation. Assuming the defendant can successfully rebut the presumption of discrimination, the burden shifts back to the plaintiff to raise a genuine factual question as to whether the proffered reason is pretextual. A plaintiff may succeed in persuading the court that she has been a victim of intentional discrimination, either directly by persuading the court that a discriminatory reason more likely motivated the defendant or indirectly by showing that the defendant's proffered explanation is unworthy of credence. The trier of fact may consider the same evidence that the plaintiff introduced to establish a prima facie case in determining whether the defendant's explanation is merely pretext. Once a prima facie case is established summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a discrimination claim is the elusive factual question of intentional discrimination.[11]

(a) *The alleged discriminatory statement.*

The Act

---

[11] (Citations and punctuation omitted.) *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (II) (A) (9th Cir. 1999).

prohibits oral or written statements with respect to [the sale] of a dwelling that indicate a 'preference, limitation, or discrimination' based on certain protected statuses . . . . Thus, to establish [McDonald's] liability [Stewart had to show that] (1) [McDonald] made a statement; (2) the statement was made with respect to the sale or rental of a dwelling; and (3) the statement indicated a preference, limitation, or discrimination on the basis of [race]. To determine whether a statement meets the third prong, courts use an "ordinary listener" standard. If an ordinary listener would believe that the statement suggests a preference, limitation, or discrimination based on a protected status, the statement is deemed discriminatory. Evidence of the speaker's motivation for making the discriminatory statement is unnecessary to establish a violation.[12]

"[D]irect [verbal] evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor."[13] Thus, the alleged discriminatory statement in this case is not an overtly discriminatory statement. McDonald deposed that her statement about barbed wire fencing was an off-hand comment based on her viewing news footage

---

[12] (Citations and punctuation omitted.) *Corey v. HUD*, 719 F.3d 322, 326 (II) (A) (2013). See also OCGA §§ 8-3-222, OCGA § 8-3-204 (b).

[13] See *Bailey*, 304 Ga. App. at 488 (1) (a). See also *Coldwell Banker Real Estate Corp. v. DeGraft-Hanson*, 266 Ga. App. 23 (596 SE2d 408) (2004) (addressing evidence of overtly racist comments regarding a home sale including "those people" and "[w]e don't need their kind here").

regarding Oscar Pistorius, a South African facing murder charges at the time. In her mind, she was trying to get the issue handled so her sellers would not lose the deal; but it was a "silly" reply to Berholtz's earlier communication, which had also been "silly." While McDonald's statement is altogether nonsensical in response to the issue of fence height, we simply cannot say that an ordinary listener would understand this statement as one that indicated McDonald had a preference or distaste for buyers of a certain race.[14] To the extent that Stewart contends that Berholtz's averrment that she found the statement prejudicial and hurtful provides evidence that an "ordinary hearer" would view the statement as racist (thereby defeating a grant of summary judgment), he provides no citation to authority showing that the trial court's inquiry into "ordinary hearer" is anything other than what a *hypothetical* "ordinary hearer" would understand with regard to the statement.[15] Accordingly, we hold that the trial court did not err by denying Stewart's claim pursuant to OCGA §§ 8-3-202 (a) (3) to

---

[14] Compare with id.

[15] See, e.g., *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905-906 (B) (2nd Cir. 1993).

the extent that he argues that the statement was an overt statement in violation of the Act.[16]

(b) *Instances of alleged discriminatory conduct.*

We now address Stewart's claims that the statement and other conduct, including (1) McDonald's threats to terminate the deal based on the issues of (a) mold and foundation remediation, the sales price reduction and closing costs reduction, and the closing attorney; (b) the split closing; and (2) the failure to provide the keys and the termite letter, are circumstantial evidence of violations of the Act pursuant to OCGA §§ 8-3-202 (a) (2) & (a) (3), OCGA § 8-3-204 (b), and OCGA § 8-3-222.[17] We hold that the trial court did not err by finding that Stewart failed to rebut McDonald's legitimate, nondiscriminatory reasons for these occurrences.[18]

First, although McDonald's statements threatening to cancel the deal occurred after Goldman's discovery of Stewart's race (at which point the information could have been conveyed to McDonald), McDonald testified that the statements were made in an effort to negotiate a good deal for her clients by limiting the amount they paid

---

[16] See also OCGA § 8-3-204 (b) (applying the Act to real estate agents).

[17] See also id.

[18] See *Bailey*, 304 Ga. App. at 490-492 (1) (b).

13

in repairs and closing costs. Stewart argues that this reason was merely pretext because, as McDonald conceded, the fence repair,[19] mold and foundation remediation, and the low appraisal, were issues that would have arisen with any purchaser, regardless of race. Stewart has not shown, however, that McDonald would not have made the same threats to terminate the sale to a buyer of a different race.[20]

With regard to the closing attorney issue, the split closing, the termite letter, and the refusal to provide the keys at the end of the closing (but prior to a complete transfer of funds), McDonald deposed that Goldman, not she, was the impetus for the refusals to use Stewart's attorney, for the decision to have a split closing, and for refusing to provide the termite letter and keys because he was upset with the amount of repairs to the house and changes to the contract that were being made after signing the sales agreement.

---

[19] McDonald noted, however, that the type of fence installed (wood versus chain-link) was an upgrade rather than a remediation; nevertheless, she previously had explained that if the deal fell through it would have been much more likely that a new buyer would have been attracted by a wood rather than chainlink fence.

[20] See, e.g., *Grant v. The Phoenix on Peachtree Condominium Assoc.*, 331 Ga. App. 306, 308-309 (2) (a) & (2) (b) (771 SE2d 15) (2015) (affirming summary judgment because there was no showing that white owners were treated differently with regard to the rule enforced against a black owner to support claims under OCGA §§ 8-3-202 (a) (2), 8-3-222).

While we question whether a seller would care about the identity of the closing attorney or would know to request a split closing independent of McDonald, and McDonald conceded in her deposition that she counseled Goldman that he was not required to provide the termite letter after closing, even if we attribute each of these actions to McDonald and take into account the statement about barbed wire fencing, we cannot say that the trial court erred by finding that Stewart failed "to provide evidence that the reasons asserted by [McDonald] were mere pretext."[21] Accordingly, the trial court did not err by granting the motion for summary judgment.

2. Stewart argues that the trial court erred by finding that he had not presented sufficient evidence to show he had suffered a distinct, palpable injury. But based on our conclusion in Division 1 of this opinion, we need not address this enumeration.

*Judgment affirmed. Phipps, P. J., and Boggs, J., concur.*

---

[21] See *Bailey*, 304 Ga. App. at 491-492 (1) (b) ("pretext is established by a direct showing that a discriminatory reason more likely motivated the defendant or by an indirect showing that the defendant's explanation is not credible") (punctuation omitted), quoting *Blockum v. Fieldale Farms Corp.*, 275 Ga. 798, 802 (4) (573 SE2d 36) (2002).